Mr. Justice CLIFFORD
 

 delivered the opinion of the court
 

 ; This'was a suit
 
 in personam,
 
 and comes before the court toy appeal from the- Circuit Court of'the United States for the southern district of Ohio, sitting in admiralty. It was commenced by the present appellees, as owners of the steamer At lantic, against the appellants as owners of the propeller Og , densburgh, and grew out of a collision which occurred on Lake'Erie; between those vessels on the 20th day of August, 1852, whereby the propeller received damage, and the steamer was run down and lost. Some change was made in the nature
 
 *554
 
 and' character of the proceeding after the suit was instituted, ■'.making it necessary that a, brief explanation should be given, in- order that the present state of the pleadings may not be •misunderstood. According to the transcript, the original libel was filed in the clerk’s office of the District Court on the 27 th day of October, 1852, and on the same day a process of attachment against the propeller, and.monition to her owners, was taken out, and was subsequently served,' pursuant to its mandate, by attaching the vessel, publishing notice to those inter ested, and summoning the respondents. On the 11th day of November following, an amended libel was filed in court, setting forth more in detail the circumstances of the collision and the grounds of the claim as made by the libellants. As amended, however, the libel still retained in some of its aspects the form of a proceeding
 
 in rem
 
 against the vessel, and a . suit
 
 in personam,
 
 against her owners.
 

 In the answer, which was not filed till after .the process was served, the appellants, as claimants of the propeller and respondents in this suit, excepted to the form of the libel, alleging that the two modes of proceeding were improperly joined, and prayed that the libel should be dismissed on that account. At the hearing in the District Court, the exception of the respondents for a misjoinder was sustained, and thereupon the libellants, on motion for leave, were permitted to amend and change'the proceeding to the form of a suit
 
 in personam
 
 against the appellants as owners of the propeller, and the cause was allowed to progress, and in that form of proceeding the parties were ultimately heard upon the merits of the controversy.Another explanation is also necessary, connected with the an swer of the respondents, as without it the subsequent proceed iugs in the cause would appear to have been irregular, and certainly would be incomprehensible. Oh the 26th day of' April, 1853, the parties entered into an agreement to the effect that the answer of the respondents in this suit should operate, as a cross-libel for the damage sustained by the propeller, and that the claims of both parties to damage' should be considered-by the: court in weighing the evidence, and be adjudicated upon in the' final decree; and in order to facilitate the investí
 
 *555
 
 gation, it was admitted in the case that the damage sustained by the propeller amounted to the sum of three thousand dollars, and that the value of the steamer was seventy-five thousand' dollars. Other interlocutory proceedings were had in the cause which it is not important to notice, and testimony was taken on both sides, and at the final hearing on the 10th' day of May following a decree was entered, that the libel be dismissed with costs; and under the authority conferred by the agreement that the answer should operate as a cross-libel, it was further ordered, adjudged, and decreed, that the libellants pay to the respondents, within thirty days, the sum of three thousand dollars, with interest, as the damage which the propeller sustained by the collision.
 

 From that decree the libellants appealed.to the Circuit Court. Much additional testimony was taken in the Circuit Court, and after a full hearing on the 12th of November, 1856, upon the pleadings as modified, and the proofs adduced by the respective parties, it was ordered, adjudged, and decreed, that the decree of the District Court be in all things reversed, and a final decree was entered, to the effect, that the damages occasioned by the collision, together with the costs in both courts, be equally divided, and that each party bear a moiety of the same; and that the respondents, pursuant to the admissions of the parties as to the amount of the damage, pay to the libellants the sum of thirty-six thousand dollars. "Whereupon the parties respectively appealed to this court, and the appeals have been separately docketed in conformity to the agreement of the parties, that the answer of the respondents should operate as á .cross-libel for the damage sustained by the propeller.
 

 Some reference to the pleadings touching the merits of the cpntroversy now becomes necessary, before we proceed to the consideration of the matters of fact in dispute between the parties in this suit. ■
 

 According to the allegations of the libel, the steamer Atlantic was duly enrolled and licensed, and was regularly employed in transporting passengers and freight, making semi-weekly trips each way, to and from Detroit, in the State of Michigan, and Buffalo, in the State of New York. She left Buffalo at
 
 *556
 
 the usual hour in the .evening of the 19th of August, 1852, with freight and a large number of passengers on board, bound on-her regular trip to the port of Detroit. And the libellants allege that she was a tight, strong vessel,, and in every respect well manned, equipped and appointed for the voyage, with a full complement' of officers and men; and that those to whom the duty properly belonged were at the time of the disaster on the look-out for the safety and protection of the vessel. They also allege that after leaving Buffalo she proceeded on her voyage in the usual route across the lake, with all her signal-lights displayed as" required by law;' that while she was so proceeding, at about half past two o’clock in the morning of the fol- . lowing day, and when she was off Long Point, on the Canada shore, the propeller Ogdensburgh, then being on her way from Cleveland to the entrance of the Welland canal, came upon the steamer, and with great force and violence ran into her, the bow of the propeller striking the larboard side of the ■ steamer near the forward gangway, breaking and crushing by the force and violence of the ■ collision into and through the guard and hull of the vessel, so that she filled with water and ' sunk, and became wholly lost to the libellants.
 

 Other matters of fact, material to the issue, are also set forth in the . libel, and among the number are the following: that the propeller, before and at the time of the collision, did not have burning, and properly displayed, the signal lights required by law;' that she was not then proceeding in the usual route from Cleveland to the entrance of the canal, and' that those in charge -of her when she came in sight of the lights of the steamer neither stopped her engines, nor slackened her speed, nor altered her course, nor took any other precaution to prevent or avoid a. collision; and the libellants aver that it was ¡otherwise with those in charge óf the'steamer; that as soon as they perceived the lights' of the propeller approaching, they put the wheel of the steamer first a-port, and then hard a-port, turning her course to the right, away from the propeller, as by law. it was .their duty to do, and that they made every effort in their power to ávoid a collision; and, finally, that the persons in charge of the propeller, though they-saw the lights of the
 
 *557
 
 steamer at a great distance, and in ample time to have prevented the disaster, did not put the wheel of the propeller a-port, or turn their vessel to the fight, away from the steamer, as they were bound to do;, nor did they stop or slow the engine, or display lawful signal lights, but so negligently, improperly, and unskilfully navigated their vessel that she ran directly and almost at right angles into and against the steamer, and thereby occasioned the disaster. Many of the affirmative, facts alleged in the libel are expressly controverted in the answer filed by the respondents. They deny that the steamer was a tight, strong vessel, or that she was well manned and appointed for the voyage; and tney also deny that the proper persons were on the look-out for the protection and safety of the vessel, or that those in charge of the steamer took any precautionary measures tó .prevent the collision.
 

 In addition to these denials, they allege, as matter of defence, that the propeller, a vessel of three hundred and fifty-three tons burden, left Cleveland on the day preceding the disaster, at about twenty minutes past twelve o’clock, deeply laden, and proceeded on her voyage, by the way of Eairmount, towards Ogdensburgh, her place of destination, which was to be reached through the canal before mentioned; that about two o’clock the next morning, and when she was steering northeast by east, on her proper course to the entrance of the canal, the wind being light and the weather somewhat hazy, the watch on her deck discovered the light of a steamer from two to three points off her larboard bow, which was supposed to be three' miles distant; that.the propeller kept on her course, running at-a speed of about seven miles an hour, until the mate, who had the watch, ascertaining that the light' was fast approaching the propeller,, gave the signal to slow, which was obeyed; and soon after,, on discovering that the light was coming still nearer, signalled to stop; and then, finding that the vessels were likely to come in contact, he directed the engine to be reversed, and gave the order to back; but in spite of all these precautionary measures the collision ensued.
 

 . Respecting the immediate cause of the collision, the theory of the respondents is, that the steamer, if she had held her
 
 *558
 
 course southwest hy west, would have passed the propeller nearly a mile on her starboard quarter; and they accordingly allege, that by putting her helm a-port. her course was turned to the right, so as to bring her across the bows of the propeller. And they also allege, in this connection, that the steamer was running with unabated speed, at the rate of fifteen miles an hour, when she fell with all her momentum upon the stem of ■ the propeller, wrenching it out of its- place, and carrying the propeller half round as she ran on her course.
 

 And- they finally allege that the persons in charge of the propeller, from the moment they first discovered the light of the steamer to the time of the collision, managed their vessel according to the most approved rules of navigation; and that the collision was wholly owing to the fault, neglect, and unskilfulness, of the officers and crew of the steamer, in changing her course across the path of the propeller, and in their culpable omission to stop the steamer, after it was found that such Change of course increased the danger, by bringing the two vessels closer together. ■ And, in accordance with the theory that the steamer was wholly in fault, they pray that their answer may .be taken -as a cross-libel in their behalf, to recover the damage sustained by the propeller, and that such sum maybe decreed to them, by reason of the collision, as in justice they are entitled to receive.
 

 Such is the substance of the pleadings, so far as respects the circumstances of the collision, and all the matters of fact to be determined by the court. ■
 

 Since the suit was commenced, the parties have examined more than one hundred witnesses; and their testimony, as exhibited, fills nearly four hundred' pages of- the. transcript. In that state of the case, a particular analysis of the testimony of each witness, and a comparison -of their respective statements, will not be attempted, as its effect would, be'to extend, the investigation beyond all reasonable limits, without any practical benefit to either party. All that can be dpne, under the circumstances, will- be to state the material facts proved, and to. refer- to such brief portions of-the evidence as seems to be necessary to confirm our conclusions. Conflicting testi
 
 *559
 
 mony we have endeavored to reconcile, where it was possible; and when not so, we have drawn our conclusions from the weight of the evidence and the probabilities of the case.
 

 With these explanations, we will proceed to state the material facts,"so far as respects the steamer Atlantic.
 

 She left Buffalo between nine and ten o’clock in the evening of the day preceding the disaster, having on board, in addition to her freight, nearly five hundred passengers, of 'whom more than one hundred- were' lost. At the time of her departure, she was in every respect seaworthy, and was well manned and appointed for the voyage, with a competent master and a sufficient and competent crew. Steamers, on leaving Buffalo for Detroit, usually steer southwest by west; and the Atlantic, following her accustomed route., pursued that general course during the night, until she made Long Point light, on the Canada shore, when the officer in charge of her deck changed her course one-fourth of a point to the southward, in order to give the light a wider berth. "When abreast of that light, and about two miles distant from it, the steamer resumed her former course, about southwest by west, and continued on her voyage, without any .other change, until the second mate, who had charge of the deck, discovered two white lights three-fourths of a point off her larboard bow, when he ordered the wheelsman to port her helm, and the order was obeyed.
 

 Nothing additional occurred during the voyage, of any importance in this investigation, up to the time those lights were discovered by the .second mate. His watch, which commenced shortly after the steamer -was outside, had not then closed, and of course he was- properly in charge of the deck. He testifies, that at.first he saw only one light, and then another, and that they appeared like glimmering stars, and at first view he was unable to determine whether they were stars or the lights of a vessel; but upon further observation he supposed they were the lights of a sail "vessel, and accordingly gave the order to port the. helm. That order was given while the officer who issued it was standing in the pilot-house, which was situated on the forward part of the hurricane deck, at the usual elevation, in steamers of that description, above the water-line of
 
 *560
 
 the vessel. She was a first-class steamer, of eu-ht hundred tons harden, and was moving through the water at the rate of sixteen miles an hour, and the officer in charge of the deck, and who gave the order to port the helm, was the only look-out stationed on any part of the vessel; and it is not pretended that either officer or seamen, other than the officer of the deck, had been assigned to that duty during the voyage.
 

 Two other persons, the wheelsman and a passenger, were in the pilot-house with the second mate, both when he discovered the lights and when he gave the order to port the helm; and the evidence shows that he went there for a purpose connected with his duty as officer of the.dock; .and he testifies that he had not been inside more than two minutes when he first saw the light. After having given the order to port the helm, he immediately left the position where he had been standing,.and went on to the top of the pilot-house, and then 'he says the signal lights of the Atlantic, which were properly displayed, and were burning brightly, shone on to the approaching vessel, and enabled him to see that she was a steamer, and that the two vessels were very close together. His own account of what followed shows conclusively that the knowledge he then for the first time obtained, as to the character of the approaching vessel, was too late to enable him to adopt the necessary precautions to avoid the impending peril. On seeing the propeller, and ascertaining the danger of his situation, arising from the closeness of her approach, he ordered the holm of the steamer hard a-port, and, without waiting to know whether the order was obeyed, put his hand on to the telegraph, with a view to give the signal to stop; but perceiving that th. collision was almost certain, he omitted to signal, concluding that the only chance of safety was to rely upon the velocity of the steamer, and the operation of her helm under the order already given, which, it seems, was promptly obeyed. Precautionary measures could not then be effectually adopted, as the time and opportunity to render them available had passed, and the two vessels almost immediately came together, the propeller striking the larboard side of the steamer near the forward gangway, crushing through the guard and hull of the steamer, and
 
 *561
 
 otherwise damaging her, so that.before she had run a mile she filled with wateFand sunk in the lake. These facts are drawn from the' testimony of the witnesses who were on the deck of the steamer or in her pilot-house, and are believed to be substantially correct, and to correspond with the events as they occurred. They all concur in saying that they did not see any-signal, lights on the propeller as she approached, and supposed she was a sail vessel till it was too late to stop the engine, and • affirm most confidently, that if good signal lights had been shown, they would have seen them. Those shown' by the steamer, were seen by the mate of the propeller when the vessels'were three miles apart, and several witnesses testify that such lights, if properly shown, as required by law, could be seen at the distance of four or five miles; and in view of the evidence as to the state of the weather and the character of the night, we have no doubt they might have been seen; if burning brightly, in ample timé to have prevented the disaster. All the witnesses agree that the wind was light, and the surface of the lake smooth, and they generally admit that there was some mist or haze on the water; but assert in the most positive terms that it was starlight overhead, and no one pretends that it was unusually dark. Good signal lights, under such circumstances, if burning brightly, could readily be seen, notwithstanding the haze on the water, at a sufficient distance to enable steamers approaching each other to adopt every necessary precaution to avoid a collision.
 

 Having stated the principal facts proved, as they appear to the court, so far as respects the steamer, we will now proceed to the examination of those of a corresponding character which relate to the propeller. More difficulty attends this branch of the inquiry, on account of the conflicting state of the testimony, and the consequent uncertainty in which the facts are involved. Some of the facts, however, are fully proved, and to those we will first invite attention. As alleged in the answer, the propeller left Cleveland, on the day preceding the disaster, on her downward trip from Chicago to Ogdensburgh, which was to be reached through the "Welland canal. No doubt is entertained that she was a good strong vessel, and there is nothing
 
 *562
 
 ib the testimony to call in question either the competency of her master or the sufficiency of her crew. It appears, by the testimony of her master, that she left Cleveland about noon, and ran down opposite Grand river by daylight; that after arriving there she steered, for about an hour, east-nórtheast, and then turned to northeast by east till the vessels came together. This last statement, however, is obviously mere hearsay, as the watch of the mate commenced at twelve o’clock at night, and he continued in charge of the deck until half past two in the • morning, when the collision occurred; and the master admits, what it is important to observe, that it was usual when they got down off Long Point, and found themselves out of the way,
 
 “to
 
 steer accordingly,” by which we understand him to mean that it was usual, when they got down there, to regulate the course of the propeller with respect to the well-known position of Long Point, and perhaps with a view to make that light, in the further progress of the voyage, which is proved to be the most prominent light on the route. At twelve o’clock the mate took charge of the deck, and he says he kept the propeller on a course of east-northeast until two o’clock, and then hauled her off from the southern shore, to northeast by east, and that soon after he saw a light two points or two and a half points off her starboard bow. Could this statement of the mate, in regard to the course of the propeller, be regarded as correct, we should be obliged to acquit both’ vessels, upon the ground that the alleged collision never took place, as obviously it could not, assuming that the course of the steamer has been correctly ascertained. His testimony in this particular, therefore, must be considered as foundéd in mistake; and it is proper to. remark that he is contradicted in so many particulars, and is proved to have made so many contradictory statements in respect to the circumstances of the collision, that we deem it unsafe to give full credence to his statements, especially in regard to such matters in controversy as obviously involve the vindication of his. own conduct in the management of the vessel. Rejecting his statement as incredible, because inconsistent with the admitted and well-established facts in the case, we are left without any satisfactory testimony nr the record
 
 *563
 
 from which the precise course of the propeller, for one or two hours before the collision, can be ascertained with any reasonable degree of certainty.
 

 Looking at the other facts and circumstances in the case, there is much reason to conclude that the inexperience and ignorance of the mate led him, in the early part of his watch, to adopt a route somewhat nearer to the southern shore than had.been usual, until he got down off Long Point; and find- • ing, on arriving there, that he was too far to the southward, he then changed the course of the propeller to the one she was pursuing when the lights of the steamer were first discovered; and this view of the case finds support in the fact proved by ' the master, that it was usual to correct any irregularity in the course at that stage of the voyage. - That the propeller was south of the Atlautic when her mate discovered the signal , lights of the latter vessel, is proved beyond all reasonable doubt, and is in effect admitted by the mate in that part of his testimony where he says that the bearing of her lights, when he first saw them, was two or two and a half points off the starboard bow of the propeller. Her. course then was in an eastei’ly direction, and it is equally well established that her white lights were first seen on the steamer, whose course was westerly off her larboard bow. Assuming these two facts to be true, of which there is no doubt whatever, and it necessarily follows that the propeller was south of the Atlantic, and such, it is believed, was the real fact. Both vessels were injured by the collision, and additional light is shed upon this inquiry by the evidence in the case as to the localities in the respective vessels where the damage was received. All, or nearly all, the damage received by the propeller was in her starboard bow, near the stem, and it was the larboard side of the steamer, near the forward gangway, that was so crushed and broken in as to cause her to fill with water and sink. These circumstances, taken in connection with the well-established fact that the mate of the propeller, who had charge of her deck, persistently maintained that he had a right to keep his colirse, and that it was the duty of the steamer to adopt the necessary precautions to keep out of the way, furnish strong grounds of
 
 *564
 

 '
 
 presumption that no • considerable change was made by the propeller until the peril was impending and the collision inevitable. Any change of course, if made under such circumstances, whether to the starboard or larboard, would not constitute a compliance with the rules of navigation, because it would be too late to accomplish the purpose for which precautions are enjoined.
 

 Much discussion also took place at the bar upon the question whether the propeller^ at the time of the collision, had proper signal lights displayed, as required by law. On that point, the evidence shows that her signal lights were seasonably set and properly displayed at the usual hour, and were burning brightly throughout the early part of the night; and no doubt is entertained that they continued to burn, so as to answer the purpose for which they are required, till after twelve o’clock, when the watch of the mate commenced. It is, however, clearly proved that it was usual and necessary to clean and trim them, and perhaps supply them with additional oil, about the middle of the night; and the steward, who was assigned to that service, and whose duty it was to see that it was properly performed, testifies that her signal lights were neglected in that particular on the. night
 
 of
 
 the collision, and, consequently, were burning so dimly when. it occurred, that they could not be seen at a distance beyond twice the lefigth of the vessel; and-in confirmation of-this statement, he says that, shortly after the- vessels came in contact, he took down the v.signal lights pf the. propeller,- by order of the master, and brushed off the crust from the wicks and trimmed them, and ■ testifies positively that they.were dim."
 

 1.
 
 Our conclusions upon this state of the evidence will now be briefly stated, commencing with-the propeller; and’wefind that she was in fault, because she did not have a competent and skilful officer in charge of her deck, and because it appears that his want of qualifications and unskilfulness contributed to the collision. Owners of vessels, and especially those who own and employ steamships, • whether propellers or side-wheel steamers," must see to it that the master and other officers intrusted with their control and management are skilful and-
 
 *565
 
 competent to tlie discharge of their duties, as, in case of a disaster like the present, both the owners and the vessel are responsible for their acts, and must answer for the consequences of their want of skill and negligence; and this remark is just as applicable to the under officers, whether the mate oi second mate, as to the master, during all the time they have charge of the deck. That the mate in this case was substantially without experience in navigating steamers, and utterly • destitute of the requisite information to fit him to determine the proper courses of the Voyage, are facts so fully proved that it is difficult to regard them as the proper subjects of dispute; and what is more, the master knew his unfitness When he' started on the voyage, and stated, before the vessel left Cleveland, to the effect that he was afraid that he was going to be sick, and that he had no confidence in the mate.. Some of the owners also distrusted his fitness when they employed him, and made an effort to engage another person in his stead; and one of them, after having heard of the disaster, expressed his regret that the person to whom he first applied had not taken his place. Ve forbear to pursue this branch of the subject, only remarking, in addition to what has already been stated, that the evidence to establish his unfitness and ineompeteney for the place is full and conclusive.
 

 2.
 

 The propeller is also in fault because she did not have signal lights properly displayed, as required by law; and this conclusion is intended to apply to the entire period after the steamer came in sight, the weight of the testimony tending strongly to show that they were little better than if they had been actually extinguished. At all events, it is satisfactorily shown that they were burning so dimly as not to fulfil the purpose and object for which they are required. There is some conflict in the statements of the witnesses on this- point; but the testimony of the steward, whose duty it was to repair them, and who, by the command of the master, attended to the service shortly, after the collision, appears to be entitled to belief, and when considered in connection with the positive affirmation's of the witnesses for the libellants, that they looked for signal lights on the propeller as she approached, and saw none, seems to be
 
 *566
 
 decisive of the question. Signal lights are required by the act of Congress, in order that they may be seen by an approaching vessel in season to enable those in charge of her to ascertain, and adopt the necessary precautions to prevent a collision with the vessel whose lights are so displayed; and when they are extinguished, or burning so dimly as not to fulfil the purpose and object for which they,are required, they do not and cannot constitute a compliance with the act of Congress.
 

 3.
 
 The propeller is also in fault, for the reason that the officer in charge of her deck neglected "seasonably and effectually to change the course of the vessel, and persistently kept her on her course after he discovered the signal lights of the steamer, rendering it highly probable that it was this error, no less than the former, which contributed to the collision. Many circumstances tend to show that if he had adopted the usual precaution the disaster might have been avoided. Comment upon this proposition is unnecessary, as in its legal aspect it imputes to the propeller a palpable violation of the rules of navigation, and the theory of fact on which it rests is substantially supported by the testimony of all the witnesses on both vessels, and by no one more fully than by the mate of the propeller, who had charge of her deck. He admits that he saw the signal light of the steamer when she was three miles distant, and he expressly states that the propeller was kept precisely on her course, until he saw that the steamer was very near, and then he says he gave the signals to stop and back; and at the same time that he signalled to stop, he told the man at the wheel to put the helm hard a-starboard, and he says the order was obeyed.
 

 Full damages are claimed by the libellants, not only on the ground that the evidence shows that the steamer was without fault, but upon the further ground that the propeller, under the circumstances of this case, is made liable by the fifth section of the act of the 3d of March, 1849, for all the loss or damage which the steamer sustained. A brief reference, however, to the provision referred to, will show that the construction cannot be supported Steamboats and propellers navigating the lakes are required by that section to carry a trian
 
 *567
 
 guiar light, shaded green on the starboard side, and red on the larboard side, with reflectors, and to be of a size to insure a good and sufficient light; and the owners of such vessels neglecting to comply with the regulation are declared liable to the injured party for all loss or damage resulting from such neglect It is insisted by the libellants that the owners of the propeller, inasmuch as she did not show good and sufficient signal lights, are liable to them in this case, under a proper construction of that provision, for all the damage occasioned to the steamer by the collision. Such is not the language of the section, and we think the construction contended for would be both unwarranted and unreasonable. Owners of the vessels named in that section are made liable for the consequences resulting from their own acts, or from the acts of those intrusted with'the control and management of their own vessel, and not for any damage resulting from the misconduct, ineompetency, or negligence, of the master or owners of the other vessel. They are made liable for their own neglect, and not for the neglect of the other party. Failure to comply with the regulation, in case a collision ensues, is declared to be a fault, and the offending party is made responsible for all loss or damage resulting from the neglect; but it is not declared by that section, or by any other rule of admiralty law. in the jurisprudence of the United States, that the neglect to show signal lights, on the part of one vessel, discharges the other, as they approach, from the obligation to adopt all reasonable and practicable precautions to prevent a collision. Absence of signal lights in cases falling within the act of Congress renders the vessel liable to the extent already mentioned, but it does not confer any right upon the other vessel to disregard or violate the rules of navigation, or to neglect any reasonable and practicable precaution to avoid a collision, which the circumstances afford the means and opportunity to adopt. Steamers displaying proper signal lights are in that respect without fault, but they have other duties to perform to prevent collisions, besides complying with that requirement, and their obligation to perform such other duties remains unaffected by anything contained in the provision under consideration. As an
 
 *568
 
 illustration of our views upon the subject, we will suppose the case of two steamers approaching on intersecting lines. They are required by the act of Congress to show signal lights, in order that each may be seen by the other in time to adopt reasonable and necessary precautions to prevent a disaster like the present; and if one has such lights, and the other has not, yet if the one having such lights actually sees the other vessel as she approaches, in ample season to avoid the collision, and neglects to take any-proper precaution to prevent it, and it ensues, it cannot be said in éuch a case that all the loss or damage resulted from the neglect of the vessel without such lights, as the collision might have been prevented; and, but for the negligence or perverseness of those in charge of the vessel showing lights, would never have occurred. We are not prepared to admit that a fair construction of the section referred to would absolve a party, under such circumstances, from pecuniary responsibility. What the judgment of the court would be in the ease supposed it is not necessary to decide, and we only advert to it as an illustration to show that the construction of the act of Congress contended for cannot be sustained. All we mean to decide is, that the neglect of the propeller to show signal lights did not vary the obligations of the Atlantic to observe the rules of navigation, and to adopt all such reasonable and necessary precautions to prevent the collision, as the circumstances in which she was placed gave her the opportunity to employ.
 

 1.
 
 The Atlantic is also chargeable with fault, because the officer in charge of her deck did not exercise proper vigilance to ascertain the character of the approaching vessel after he discovered the white lights, which subsequently proved to be the white lights of the propeller. His excuse, that he supposed she was a sailing vessel, under the circumstances of the case, as shown in the evidence, is not satisfactory. When he first dicovered those lights, the two vessels were at least a mile apart; and if it be true, as he states, that they appeared like glimmering stars, we are satisfied, from the evidence, that the distance must have been much greater, as is evident from the character of the night, and from the fact, which is fully
 
 *569
 
 proved, that the red.light of the steamer was seen, on the propeller at the distance of three miles. Those white lights, though not the signal lights required by the act of Congress, were nevertheless sufficient to apprize the officer on the deck' of the steamer that a vessel of some sort was approaching; and ' if he had performed his duty, the night being calm and the ■ wind light, he might have seasonably ascertained- that it was a propeller. They were large globe lamps, such as are usually shown by sail vessels, and were suspended in a similar manner, and the weight of the testimony clearly shows that they were burning brightly; and if so, they would hardly appear like glimmering stars at the distance of a mile, on a smooth sea, when at the same time the usual red lights carried by steamers were plainly visible at three times that distance. Two other persons were in the pilot-house with the second mate when he discovered those white lights, one of whom was a master mariner ; and although he says they did not hold any conversation, there is much reason to conclude that his estimate of the time he remained there is somewhat short of the fact. Master mariners, as well as other seafaring men, are very apt to converse when they meet on the theatre of their favorite pursuit; and the statement that they remained together in the pilot-house, even for two minutes, without speaking, needs confirmation.
 

 2.
 
 In the second place, the Atlantic is chargeable with fault, because the officer of her deck did not seasonably and effectually change the course of the vessel, or slow hr stop her engine, so as to avoid a collision, after he discovered the white lights of the approaching vessel. Whether his neglect to adopt those precautions, or some one of them, arose from inattention or rashness, is immaterial, as, in either event, it was a culpable omission of duty, plainly required by the rules of navigation in that emergency, and one which the dictate of common prudence, as well as a proper regard for the safety of his passengers, should have prompted him to perform; and the owners of the steamer must answer for the consequences of his negligence. His first order, to port the helm, was not designed to change the course of the vessel to any considerable extent, and only had the effect to open the light-of the other vessel-half a point.
 

 
 *570
 
 This is admitted, and so is the more important fact that no other change of course was made until he gave the .order hard a-port, which his own testimony shows was at the instant of collision, and not until all reasonable expectation of preventing it was gone. Nothing additional was done to avert the disaster ; and the officer of the deck admits that the speed of the steamer was not slackened at any time throughout the entire period that elapsed after he saw the white lights of the ap- . proaching vessel.
 

 On this ground, we think the steamer was clearly in fault, and that her owners are responsible for the consequences of the negligence or mismanagement of the officer in charge of the deck.
 

 3.
 
 In the third place, the Atlantic was in fault, because she did not have a vigilant and sufficient look-out. No person, either officer or seaman, was assigned to that duty, except the second mate, who also had charge of the deck and the control and management of the vessel. According to his testimony, the officer of the deck was not expected to occupy any one particular place on the vessel; but was sometimes on the top of the promenade deck, either on the larboard or starboard side of the vessel — sometimes in the pilot-house, on the hurricane deck — and sometimes on the top of the pilot-house; and, in accordance with this practice, the wheelsman of his watch, who was called by the libellants, testifies that he saw him round on the deck, attending to his duties, during all the time he was at the wheel. Steamers navigating in the thoroughfares of commerce must have constant and vigilant look-outs stationed in proper places on the vessel, and charged with the duty for whi „h look-outs are required, and they must be actually employed in the performance of the duty to which they are assigned. To constitute a compliance with the requirements of law, they must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed m the performance of that duty; and for a failure in either of those particulars, the vessel and her owners are responsible.
 

 Look-outs stationed in positions where the view forward or on the side to which they are assigned is obstructed, either by
 
 *571
 
 the lights, rigging, or spars of the vessel, do not constitute a compliance with the requirement of the law; and, in general, elevated portions, such as the hurricane deck, are not so favorable situations as those more usually selected on the forward deck, nearer the stem. Persons stationed on the forward deck are less likely to-overlook small vessels, deeply laden, and more readily ascertain their exact course and movement. Ocean steamers usually have two look-outs in addition to the officer of the deck, and in general they are stationed one on the larboard and the other on the starboard side of the vessel, as far forward as possible, and during the time they are so engaged they have no other duties to perform; and no reason is perceived why any less precaution should be taken by first-class steamers on the lakes. Their speed is quite as great, and the navigation is no less exposed to the dangers arising from the prevalence of mist and fog, or from the ordinary darkness of the night;-and the owners of vessels navigating on those waters are under the same obligations to provide for the safety and security of life and property as attaches to those who are •engaged in navigating the seas.
 

 Apply these principles to the present case, and it is obvious that the officer in charge of the Atlantic was not a sufficient look-out. He stood the watch of the master, who was below; and, as the officer of the watch, he had the charge of the deck and the control and management of the vessel; and in the midst of his varied duties it is scarcely possible that he could give his undivided attention to the special duty required of look-outs.
 

 Not long before the white lights of the approaching vessel were discovered, he had occasion to go into the pilot-house, to look at the compass; and there is much ground to presume that the disaster is more attributable to that circumstance than any other in the case, except the absence of proper signal lights on the propeller.
 

 We are of the opinion that it is a case of mutual fault, and that the decree of the Circuit Court, apportioning the damages, was correct.
 

 The decree of the Circuit Court, therefore, is affirmed, ' without costs.
 

 
 *572
 
 Mr. Justice DANIEL and Mr. Justice GREER dissented,
 

 Mr. Justice DANIEL:
 

 In the case of the Atlantic and the Ogdensburgh, it is my opinion that the admiralty powers of the United States courts do not embrace such a case.