THE JAMES A. LAWRENCE. THE COMANCHE. THE CAR FLOAT NO. 1.

(Circuit Court of Appeals, Second Circuit. May 14, 1902.)

Nos. 93, 94.

1. COLLISION—STEAM VESSELS CROSSING—FAILURE TO MAINTAIN PROPER LOOKOUT.

The claim of a tug that her failure to have a proper lookout at the time of a collision with a crossing steamer did not contribute to the collision, because she was the privileged vessel, and maintained her course and speed as required by the rules, is not sustained by evidence which shows that she did change her course before the collision, even though it was done in extremis.

Appeals from the District Court of the United States for the Southern District of New York.

These causes come here upon appeal from decrees of the district court, Southern district of New York, holding the steamship· Comanche and the steam tug James A. Lawrence both responsible for a collision between Car Float No. 1, in tow of the Lawrence, and the steamer. 97 Fed. 351.

Henry W. Goodrich, for the Lawrence.
Henry G. Ward, for the Comanche.
Lawrence Kneeland, for Brooklyn Wharf Co.

Before LACOMBE and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The collision took place about 4 a. m of December 30, 1897, under the following circumstances: The tug, with the car float on her port side, left the foot of Montague street, Brooklyn, bound to the Erie Railway docks at Jersey City. She came in collision with the Comanche, bound in from sea to her pier in the East river, just below the Brooklyn Bridge. The collision occurred 300 or 350 feet off the South Ferry slip. The tide was strong ebb, the night fairly clear, lights could be seen easily. The stem of the Comanche struck the car float about 15 feet aft of the forward port quarter. Both were damaged. "The evidence as to the time when the vessels were seen by each other, and as to their lights and signals, is," as the district judge says, "extremely confused and uncertain"; but two propositions are abundantly established by the proof. The Comanche was in fault, because, having the Lawrence on her starboard hand, she nevertheless attempted "to cross the bows of the tug and float, and go to the left, in violation of the rules and statutes." By not appealing, she concedes that she was in fault. The other proposition, abundantly proven, is that the Lawrence had no lookout. The car float projected nearly 100 feet in advance of the stem of the tug, and there were cars on it. These obstructed the view from the pilot house. The master was at the wheel of the tug; the mate was on top of the cars. In case of a light or whistle from the port side, he reported it to the master, and gave him orders what signals to sound, and how to navigate. There was no one else on lookout, and it is quite manifest that touching all vessels approaching on the port side the mate was navigator, and the master merely a wheelsman. Manifestly this was a fault, and the contention usually urged that it did not contribute, because, nevertheless, the approaching vessel was seen a long distance off, cannot be maintained, because the vessels were quite close together when they saw each other. The rules require that when vessels are crossing as these were, so as to involve risk of collision, the privileged vessel shall keep her course and speed. If, therefore, the tug did in fact keep her course and speed, her navigation would be free from fault, and it would make no difference whether her navigator was enlightened by a proper outlook or not.

The appellant contends that the absence of lookout cannot be held to have contributed to the accident, because knowledge of all the

facts which could have been obtained by a perfect lookout would not have altered the duty of the Lawrence in respect to her navigation. We are unable to accept this conclusion, because we are not satisfied from the evidence that the Lawrence did keep her course. Her master, acting as wheelsman, testified:

"Griffen [the mate] said: 'Captain, there is a steamer showing red light, and blowing us one whistle, a couple of points on our port bow.' He gave me orders to blow one long whistle, which I did, and continued my course and speed; if anything ported a little more, as much as I dared, towards the Battery. The change was a little more to port, so that she headed a little more on the New York shore."

Then he heard two short whistles from the Comanche, and Griffen reported that the steamer had altered her lights. Thereupon, "by direction of the mate, [he] gave one whistle, and slowed down." At the time of the second signal,—two whistles,—he had ported, and was heading more into the New York shore. Griffen, the mate, who was conducting the navigation from the top of the cars, testified:

"I reported to the captain 'a steamer on the port bow, showing a red light and masthead.' * * * I told him to port the wheel, and he ported it. Q. Had you changed your heading from the time of the first signal up to the time of collision? Yes, sir. * * * We put our wheel hard aport, and just at the instant of collision we were heading nearly for the Staten Island ferry."

It is suggested that this change was made in extremis. The district judge thought that the change was too great, and occupied too much time, to be so considered; but even if it were, that would not change the situation. If the fault found against the tug was changing her course when the rule told her to keep it, such error might be condoned, because she was in extremis. But the fault found, on undisputed evidence, is failure to have a proper lookout, and when the excuse offered therefor is that, despite the absence of lookout, she navigated in conformity to the rule, such excuse is not made out by showing that she failed so to navigate because she was in extremis. On the record we cannot say that she would have found herself in extremis if she had maintained a proper lookout, and therefore cannot excuse that fault.

The decrees are affirmed, with interest and costs.