**LA INTERAMERICANA, S. A., a Mexican corporation, Libelant,**

v.

**THE NARCO, her engines, etc., and Robert A. Wilson, Vincent Nardelli, Robert G. Nardelli, William Nardelli, Defendants.**

**No. 348.**

United States District Court
S. D. Florida, Miami Division.
Nov. 29, 1956.

W. S. Rodgers, Jr., Tampa, Fla., Douglas D. Batchelor, Miami, Fla., for libelant.

John P. Corcoran, Jr., Tampa, Fla., for defendant Robert A. Wilson.

John Germany, Tampa, Fla., for defendants Vincent, Robert G. and William Nardelli.

### WHITEHURST, District Judge.

This action grows out of a collision at sea between the M/V Narco and the M/V Lolita. At about 11:00 o'clock P. M. on July 24, 1953, the M/V Narco, a fishing vessel of American registry out of Tampa, Florida, rammed and sank the M/V Lolita, a fishing vessel of Mexican registry out of Ciudad del Carmen.

The collision occurred in international waters in the Gulf of Campeche, some twenty miles off the mouth of the San Pedro River, and is, therefore, governed by the International Rules for Navigation at Sea, Tit. 33 U.S.C.A. § 61 et seq.

At the time of the collision, the Narco was owned by Robert A. Wilson and insured by the Stuyvesant Insurance Company of New York, but was under a bare-boat charter to Vincent Nardelli, Robert G. Nardelli, and William Nardelli. The Lolita was owned by Consuelo Ocampo de Julian and insured by Aseguradora del Sureste, S. A., a Mexican corporation, in the amount of 250,000 pesos.

As a result of the collision and sinking, the Lolita became a total loss and the libelant, Aseguradora del Sureste, S. A., whose name was later changed to La Interamericana, S. A., paid her owner the full value of her insurance, 250,000 pesos. Being thus subrogated to the owner's cause of action (Art. 855, Mexican Commercial Code), the insurance company brought this libel against the Narco, her then owner, Robert A. Wilson, and the bare-boat charterers, Vincent, Robert, and William Nardelli (who, by the date of attachment, had become the owners of the Narco). The Nardellis impleaded the Stuyvesant Insurance Company of New York, insurers of the Narco, seeking to compel that insurance carrier to pay in the event the Narco or the Nardellis should be adjudged liable for the collision.

At the time of the collision, the Lolita was engaged in shrimping operations. The night was dark and there were squalls in the vicinity, but it was not raining at the time and the seas were not of sufficient height to interfere with navigation.

■ The Lolita was under the command of Victor Manuel Mendoza, who held a proper license from the Mexican Government. Shortly before the collision, the Lolita had been dragging her nets astern, but had stopped for the purpose of hauling them in, and at the time of the collision she lay dead in the water on a northwest heading. Her crewmen testified that she was displaying the tricolored and white lights required by the International Rules, Tit. 33 U.S.C. § 79 (d), and it is so found. The negative testimony of the Master of the Narco that he did not see any lights on the Lolita prior to the collision does not outweigh the positive testimony of those on the Lolita that her lights were burning. The Thingvalla, 2 Cir., 1891, 48 F. 764; Socony-Vacuum Oil Co. Inc., v. Smith, 5 Cir., 1950, 179 F.2d 672.

Some ten to twenty minutes prior to the collision, the Narco had passed through a fleet of shrimping trawlers. At that time she had slowed to about three knots and had made several test drags with her small tri-net. Thereafter, the tri-net was secured and the Nar-

co resumed her full speed of eight or nine knots which she maintained into collision.

Immediately prior to the collision, Robert G. Nardelli, the Master, was at the Narco's helm, two of the remaining three crewmen on board were asleep below and the third was aft in the Master's quarters. The Master was steering a generally southwesterly compass course, attempting, at the same time, to keep in about 17 fathoms of water by Fathometer reading. The Narco maintained no lookout other than the Master at the helm in the pilot house, who did not see the Lolita until looking up, after a brief reading of the Fathometer, he saw her dead ahead and too late to avoid the collision.

The bow of the Narco rammed at right angles into the starboard side of the Lolita at a point a few feet aft of the Lolita's mast, causing her to sink in about three minutes.

▇ Under the applicable International Rules, the Lolita, which was engaged in trawling operations, had the right of way over the Narco. Hertz v. Consolidated Fisheries, Inc., 9 Cir., 1954, 213 F.2d 801; The Virginia and Joan, 1 Cir., 1936, 86 F.2d 259. The rules further require every vessel to maintain a proper lookout when she is underway, Tit. 33 U.S.C.A. § 121. This duty rests upon all navigating vessels, and upon small vessels no less than large. The Marion, D.C.N.D.Wash.1893, 56 F. 271. Courts have frequently held that to fulfil this statutory requirement a lookout must be free of other duties, and that the helmsman in the pilot house cannot be considered a proper lookout. Chamberlain v. Ward, 1858, 21 How. 548, 571, 16 L.Ed. 211; The Orion, 1 Cir., 1928, 26 F.2d 603, 604. However, the statute does not invariably demand a separate lookout on the bow of the vessel; other circumstances, such as the visibility from the pilot house, the distance from the pilot house to the stem, or the condition of the sea and weather may, in certain circumstances, excuse the necessity for a separate lookout. " * * * the question

of competency of a lookout in any instance is primarily one of fact, to be realistically resolved under all the circumstances * * *." Parker Bros. & Co. v. De Forest, 5 Cir., 1955, 221 F.2d 377, 380.

▇ Under the circumstances of this case, however, either the lights of the Lolita would have been clearly visible to an attentive helmsman in the Narco pilot house and the Master's failure to see them was due to negligence and inattention on his part, or else, if the lights of the Lolita were not clearly visible from the Narco's pilot house, she had no proper lookout. The Commonwealth, 9 Cir., 1930, 36 F.2d 581. In either event, the Narco's failure to see and avoid the Lolita was the proximate cause of the collision, and the Narco and her charterers, the Nardellis, are liable therefor.

▇▇ Robert A. Wilson, the owner of the Narco on the date of the collision is not liable, however, as at the time of the collision the Narco was under a bare-boat charter, and it is long-settled Maritime Law that in such circumstances no in personam liability attaches to the owner for damages occasioned by errors in the charterers' navigation. It follows the Stuyvesant Insurance Company of New York, as insurer of the Narco at the time of the collision, is not liable to the claimants, Robert, Vincent and William Nardelli, because, by the terms of the policy, the insurer's liability to charterers is limited to instances where the owner as such would be liable, and this provision refers to the owner at the time of collision, Robert A. Wilson.

▇ The value of the Lolita at the time of her sinking was 258,000 Mexican pesos. The sum paid to the owners of the Lolita under its policy of insurance being less than the full value of the Lolita at the time of her loss, the libelant is entitled to recover from the Narco and from Vincent, Robert and William Nardelli a sum equivalent to 250,000 Mexican pesos. This Court can only decree recovery in United States currency. Liebeskind v. Mexican Light & Power

Co., 2 Cir., 1941, 116 F.2d 971. The rate of exchange to be applied is the rate in effect on the date of collision, July 24, 1953. Indemnity Mutual Assurance Co. v. U. S., 1935 A.M.C. 809. Under such rate (one Mexican peso equals 11.63 cents), the principal sum to be awarded libelant is $29,075, together with interest from the date of loss and costs.

Judgment will be entered accordingly.