**OSAKA SHOSEN KAISHA, LTD.**

v.

**THE Motor Vessel ELENE, her engines, tackle, etc.**

**ANGELOS, LEITH & CO., Ltd., Cross-libelant,**

v.

**THE Motor Vessel ATLAS MARU, her engines, boilers, tackle, etc., Cross-respondent.**

**Admiralty No. 3874.**

United States District Court
D. Maryland.

Jan. 6, 1961.

Southgate L. Morison and Ober, Williams, Grimes & Stinson, Baltimore, Md., proctors for libelant and cross-respondent.

Robert H. Williams, Jr., Baltimore, Md., proctor for respondent and cross-libelant.

THOMSEN, Chief Judge.

The libel and cross-libel herein arise out of a nighttime collision in Baltimore harbor between the Japanese M.V. Atlas Maru and the Greek M.V. Elene.

The witnesses from the Elene testified that at the time of the collision the Elene was safely anchored in Deep Water Anchorage No. 3, several hundred feet east of the Fort McHenry Channel, dead in the water, with her engines and all engine valves cut off, when the Atlas Maru came into the anchorage and struck the Elene's bow. The witnesses from the Atlas Maru testified that their vessel was proceeding northerly up the channel at a slow speed when the Elene, showing only anchor and cargo lights, suddenly and without warning came out into the channel at a speed of about three knots, and that the bow of the Elene struck the starboard side of the Atlas Maru between the first and second cargo hatches. The parties agree that the bow of the Elene and the starboard side of the Atlas Maru came into contact, and that the Elene was showing anchor lights but no running lights. Beyond that, the two versions cannot be reconciled, and the pilots, officers and crews of the two vessels were not convincing witnesses. Fortunately, we have the relatively impartial and much more persuasive testimony of two crewmen on a tug, which had made fast to the starboard side of the Atlas Maru two or three minutes before the collision and barely escaped from its dangerous situation, and of an apprentice pilot on the Atlas Maru, all of whom testified that the Elene came out into the channel a minute or two before the collision.

The Elene had been anchored in No. 3 Anchorage at about 2021, E.S.T., with her bow 450 feet more or less east of the east line of the channel, pointing toward the channel at a right angle. The weather was fine, and all parties agree that the tide and wind played no part in the collision.

The engineer, the donkeyman and the engine driver of the Elene testified that she had developed a "leakage of water" into her port engine, which made it necessary to move her into the anchorage, to cut off her engines and all engine valves, and dismantle and dismount the exhaust valve of the cylinder and cylinder cover of the port engine. They further testified that this prevented the propellers from being started; that there was no movement of the Elene caused by her engines or propellers; that a turning gear was used to turn the port engine enough to repair it, but that it did not turn the propeller more than one revolution every two or three minutes, not enough to set the ship in motion; that the auxiliary boiler necessary to warm the engines of the Elene was cut off, and that the engines required at least an hour's preparation before starting

Since I believe the testimony of Apprentice Pilot Trott and the men on the tug that the Elene moved out into the channel a minute or two before the collision, the testimony of the Elene's engineers must be something less than the whole truth. It is reasonably inferable that they attempted to locate the leak or to test whether it had been repaired, by causing the engine to turn over slowly, trusting the anchor to prevent the vessel from moving. But it is not necessary to decide why the Elene was under way or drifting; it is sufficient to find as a fact that she was.

■ An evidence question must be considered in connection with this point. Captain Green, the pilot on the Elene, was sleeping just before the collision. He testified at the trial that he was awakened by whistles, and in a matter of seconds felt the bump. He further testified that he did not hear the noise from the stack which is usually heard when the motor of the Elene is running. When asked whether that indicated to him that the engines were not running, he replied: "Indicated to me

the engines definitely were not running." On cross-examination, the proctor for the Atlas Maru produced Captain Green's testimony at the Coast Guard hearing on 1 October 1956, and offered extracts therefrom which included the two following questions and answers: "Q. Could you feel, at the time, whether or not your own ship's engines were in operation? A. I couldn't tell. The ship was loaded. I don't think they would be going full ahead. * * * Q. What in your opinion caused the collision? A. In my opinion, the cause of the collision was the fact that the engines on my vessel were in operation while my vessel was anchored and while I was not on the bridge." After argument, those extracts were admitted to impeach the testimony of Captain Green at the trial. That ruling is supported by Atlantic Greyhound Corp. v. Eddins, 4 Cir., 177 F.2d 954, at pages 957, 958; McCormick on Evidence, p. 65; 3 Wigmore on Evidence, 3d ed., para. 1041, p. 729. The proctor for the Elene, after objecting to the admissibility of the extracts, asked that if they be admitted, additional extracts from Captain Green's testimony at the Coast Guard hearing also be admitted. The proctor for the Atlas Maru objected to the admission of the additional extracts, but they are clearly admissible, not to prove the statements contained therein as facts, but to show the basis for the statements made by Captain Green in the extracts offered by the proctor for the Elene.

After considering all the extracts, on the question of impeachment only, I find that Captain Green did not hear any noise from the stack, either because he was only half awake, or because the engine had been shut off before he wakened, or because the engine was not turning over fast enough to cause any vibration or noise. In any event, his testimony is not inconsistent with the conclusion that one of the engines had been turned on briefly at a very slow speed; or that the Elene had otherwise been set in motion a few minutes before the collision.

The Elene produced a marine surveyor, who testified that in his opinion the Elene was not moving at the time of the collision. Although I do not agree with his conclusion, I am persuaded by his testimony, the photographs, and the rest of the evidence that the Elene was moving very slowly, not over one knot, and that the Atlas Maru was making about three or four knots at the time of the collision. I further find that the collision took place in the channel, about 110 feet from the east side thereof.

Since the Elene came out into the channel showing her anchor lights and not her running lights, without signaling and apparently without a lookout, it is quite clear that she was at fault and that her fault caused or contributed to the collision. 33 U.S.C.A. §§ 172, 221. Whether the Atlas Maru was also at fault requires consideration of additional facts.

The Atlas Maru passed Fort Carroll, some 4,000 yards from the point of collision, at 2123,[1] having reduced her speed from full ahead to half ahead at 2118. Shortly after passing Fort Carroll, her pilot and master were notified that the berth at which she was to be docked was occupied; the speed of the vessel was therefore reduced and she proceeded with her engines at slow ahead (2127), stop (2128½), dead slow (2131), stop (2132½), dead slow (2133½), stop (2136 to 2148). Her pilot, master, quartermaster, and a number of others, including the apprentice pilot, were on the bridge, but none of them was charged with the sole duty of looking out

---

1. All times given are E.S.T., according to the clocks on the Atlas Maru. The Elene was using daylight time, and her clocks were a total of 1 hour 19 minutes ahead of the clocks on the Atlas Maru.

There is also an apparent discrepancy of about 1 minute between the clocks on the bridge and in the engine room of the Atlas Maru, even accounting for the time necessary to execute orders.

The anchor detail, consisting of the chief mate, boatswain, carpenter and two or three seamen, had gone forward when the vessel passed Fort Carroll, but again, none of them served as a lookout and none of them reported anything to the bridge.

Shortly after passing Fort Carroll the pilot and master of the Atlas Maru had noticed a number of vessels at anchor in No. 3 Anchorage, to the east of the channel; all of them were showing anchor lights. At 2145 the Atlas Maru passed buoy No. 12M, at the southwest corner of No. 3 Anchorage, on her starboard side at a distance of about 100 feet. Her course was 321, straight up the channel, and her speed was around three knots at the time (2145) the tug Gannet pulled up along her starboard side. At 2149 the tug made fast to the starboard side of the Atlas Maru, and the tug's master went aboard the ship, whose engines had been put on dead slow at 2148.

After the master left the tug, one of the tug's crew called to Mamliti, who had been left in charge of the tug, that one of the ships in the anchorage was coming toward the Atlas Maru. Mamliti blew danger signals and at about the same time (2150) the pilot of the Atlas Maru noticed that the Elene was coming out of the anchorage. He immediately (2150 plus a small fraction) ordered the wheel of the Atlas Maru to be put hard aport and her engine full ahead, to increase her turn to the left, and less than half a minute thereafter ordered her engine full astern. These orders are not subject to criticism since putting the engine full astern immediately would have tended to turn the bow of the Atlas Maru toward the right and therefore toward the Elene and the preliminary turn to the left tended to offset this effect. The Atlas Maru continued her forward motion, as did the Elene, and at about 2151 the two vessels collided, at an angle of about 85°.

After the collision the two vessels sheered off and both proceeded in their new directions for very short distances.

Since the Elene moved about 450 feet to the east line of the channel and 110 feet into the channel before the collision, at a speed which never exceeded one knot, she must have been in motion for at least seven minutes. It is not possible to say with precision at what point a proper lookout on the Atlas Maru would have noticed that the Elene was moving toward the channel. But if one of the crew, at the bow or on the bridge, had been charged with the sole duty of looking out, he should have noticed that the Elene was moving toward the channel at least two or three minutes before she entered the channel, when her position and motion were actually noticed by the pilot and the master of the Atlas Maru. The crew of the tug had not only observed the Elene in motion before she entered the channel but had blown a danger signal.

■ The Atlas Maru did not have a proper lookout. See Griffin on Collision, ch. VII, p. 262 et seq., esp. pp. 271–275, 277–283, and cases cited. Although no specific location on a vessel is prescribed for the lookout, such location should be at the point best suited for the purpose of hearing and observing the approach of objects likely to be brought into collision with the vessel. The Vedamore, 4 Cir., 137 F. 844. Under the circumstances, it would have been desirable to have a lookout in the bow. Chamberlain v. Ward, 21 How. 548, 571, 62 U.S. 548, 571, 16 L.Ed. 211; The Manchioneal, 2 Cir., 243 F. 801; The Verona, 4 Cir., 65 F.2d 714; Griffin on Collision, sec. 107. But wherever he was located, he should have had no other duties. The Genesee Chief, 12 How. 443, 462, 53 U.S. 443, 462, 13 L.Ed. 1058; Chamberlain v. Ward, supra; Griffin on Collision, sec. 109. It is not safe to depend on the pilot or others on the bridge, who are charged with various

important duties and responsibilities. The Richmond, E.D.Va., 275 F. 970, 973, affirmed per curiam 4 Cir., 294 F. 90; The Orion, 1 Cir., 26 F.2d 603; The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L. Ed. 165; Farwell, Rules of the Nautical Road (U. S. Naval Institute, Annapolis, 1954), p. 370; Le Boyteaux, The Rules of the Road at Sea, p. 220. United States v. The Holland, D.Md., 151 F. Supp. 772, 777.

Failure to have a proper lookout is treated as equivalent to a statutory fault. In The Madison, 2 Cir., 250 F. 850, 852, Judge Learned Hand said: "It is true that this failure of the lookout was not a violation of any statutory rule; but we do not distinguish between the burden imposed upon a vessel which violates so stringent a requirement, although it depends only upon customary law, and that concededly imposed by the violation of a statutory rule." See also The Ariadne, 13 Wall. 475, 479, 80 U.S. 475, 479, 20 L.Ed. 542; The Geo. W. Roby, 6 Cir., 111 F. 601; The Anna W., 2 Cir., 201 F. 58; The Georg Dumois, 4 Cir., 153 F. 833, 835.

■ The Atlas Maru has not shown that a proper lookout would not have noticed the movement of the Elene in time to avoid the collision. Indeed, I find that a proper lookout would have observed the movement of the Elene in time to have permitted the Atlas Maru to turn to the left and thus to have avoided the collision. Although the orders of the master and pilot of the Atlas Maru during the last minute or two before the collision were not negligent, a vessel cannot claim the benefit of the *in extremis* rule where she has been brought into the dangerous position by her failure to have a proper lookout. The James A. Lawrence, 2 Cir., 117 F. 228.

Both vessels were at fault and must contribute equally to the damages. The Schooner Catherine v. Dickinson, 17 How. 170, 58 U.S. 170, 15 L.Ed. 233; Tank Barge Hygrade v. The Gatco New Jersey, 3 Cir., 250 F.2d 485, 487; Curtis Bay Towing Co. v. Sadowski, 4 Cir., 247 F.2d 422.

I will sign an appropriate interlocutory decree.