UNITED STATES of America, owner of the U.S.S. DARBY (DE 218), Libelant,

v.

S.S. SOYA ATLANTIC, her engines, boilers, tackle, etc., in rem and against Rederi A/B Walltank, owner of the S.S. Soya Atlantic, in personam, Respondents.

REDERI A/B WALLTANK, as owner of the S.S. Soya Atlantic, Cross-Libelant,

v.

UNITED STATES of America, owner of the U.S.S. Darby (DE 218), Cross-Respondent.

Helen Hesson CRANDELL, Administratrix of the Estate of Charles Edward Crandell, deceased, Libelant,

v.

S.S. SOYA ATLANTIC, her engines, boilers, tackle, etc., in rem and against Rederi A/B Walltank, owner of the S.S. Soya Atlantic, in personam, Respondents,

v.

UNITED STATES of America, Respondent Impleaded.

Bertha Louise JOHNSON, Administratrix of the Estate of Thomas Edward Johnson, deceased, Libelant,

v.

S.S. SOYA ATLANTIC, her engines, boilers, tackle, etc., in rem and against Rederi A/B Walltank, owner of the S.S. Soya Atlantic, in personam, Respondents,

v.

UNITED STATES of America, Respondent Impleaded.

Admiralty Nos. 4170, 4225, 4290.

United States District Court
D. Maryland.

Jan. 2, 1963.

See also D.C., 199 F.Supp. 303.

Joseph D. Tydings, U. S. Atty., Baltimore, Md., Alan Raywid and Charles D. Ferris, Dept. of Justice, Washington, D. C., for the United States.

Calvin E. Cohen, Baltimore, Md., for Crandell.

J. Calvin Carney, Baltimore, Md., for Johnson.

Southgate L. Morison and Ober, Williams, Grimes & Stinson, Baltimore, Md., Eugene F. Gilligan, Eli Ellis and Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for respondent, cross-libelant.

NORTHROP, District Judge.

These actions arise out of a collision between the U.S.S. DARBY (DE 218), a destroyer escort of the United States Navy, and the S.S. SOYA ATLANTIC, a Swedish vessel owned by Rederi A/B Walltank. The United States has filed a libel against the SOYA ATLANTIC and her owners, who, in turn, have filed a cross-libel against the United States. Also, two seamen aboard the DARBY were killed as a result of the collision; their legal representatives have brought two separate wrongful death actions against the SOYA ATLANTIC and her owners, who there have impleaded the United States. The cases have been consolidated and presently are before the court on the question of liability only.

## I

The DARBY is a steel hull destroyer escort 306 feet in length with a beam of 36 feet, a draft of 12 feet, and a light displacement tonnage of 1400 tons. She is capable of speeds up to 24 knots.

The SOYA ATLANTIC is a combined tanker and ore carrier, 596 feet in length and with a beam of 75 feet. She is capable of speeds up to 15 knots. Her bow is plated with steel of a thickness suitable for safe navigation in icy waters, and her bridge is located amidships. At the time of the collision, the SOYA ATLANTIC had a displacement tonnage of about 20,325 tons and a draft of about 17 feet forward and 27 feet aft.

Of the two vessels, the DARBY is smaller, lighter, faster, and draws less water; her turning radii and stopping distances are shorter. In brief, the DARBY's maneuverability is vastly superior to that of the SOYA ATLANTIC.

The collision occurred on March 19, 1960, at approximately 1952.[1] Sunset had occurred at 1811, and twilight ended at 1940. Weather conditions were excellent; it was a dark, clear night with neither clouds nor haze. Visibility, under the circumstances, was excellent. It

---

1. The time of collision has been very much in dispute. The SOYA ATLANTIC's log indicates a collision time of 1953; the DARBY's log, between 1945 and 1946. Both sides introduced evidence in an attempt to demonstrate the correctness of their respective clocks. Probably, both logs are roughly correct in representing their respective bridge times, but the SOYA ATLANTIC's clocks were fast, the DARBY's were slow, or both. The court does not believe it necessary to conclusively resolve this conflict, although such a substantial discrepancy is certainly surprising. But, for an instance of an even greater time difference, see Osaka Shosen Kaisha, Ltd. v. The Elene (Angelos, Leitch & Co., Ltd.), 190 F.Supp. 201 (D.Md. 1961), affirmed in part and reversed in part 301 F.2d 59 (4th Cir. 1962). Largely as a matter of convenience, most of the times urged by the SOYA ATLANTIC have been adopted in the recitation of facts herein.

More important than clock readings is the actual elapsed time between the SOYA ATLANTIC's dropping off her pilot and her reaching the point of collision. In view of the SOYA ATLANTIC's navigational capabilities on the night in question, the court is convinced that this period must have been in excess of ten minutes.

All compass headings referred to in this opinion are true, rather than magnetic. And, wherever distances are expressed in terms of miles, such expressions refer to nautical miles, rather than land miles.

was estimated that the "loom" of the SOYA ATLANTIC, were her navigational lights not burning, could have been identified from a distance of 2 miles and that, with her lights burning, she could have been identified against a background of coastal lights from a distance of 5 miles. Also, radar reception was optimal, with two exceptions: "sea return" on the DARBY's radarscope obscured objects within a radius of her of a mile and a half, and the representation of all other objects was unusually large. The tide was ebb at not more than one and a half knots, in a southeasterly direction of 125°.

The location of the collision was at the mouth of the Chesapeake Bay, approximately one and a half miles 48° from the Cape Henry Lighthouse and about half a mile 210° from Buoy 2A. The Inland Rules establish the standards of navigation in this area, which was described at trial as probably the busiest marine intersection in the world. A chart of the area is included here, representing the approximate projected courses of the respective vessels.

The DARBY is a Navy Reserve training ship equipped for anti-submarine warfare. During the day of the collision, she, along with other Navy ships, participated in training exercises off the coast of Virginia. Acting as her Captain was Commander John C. Allen. He was familiar with the waters at the mouth of the Bay and had navigated there before. However, March 19 was the first time he ever had attempted to navigate in this area under nighttime conditions.

During the anti-submarine maneuvers just mentioned, the DARBY was flagship for her flotilla. Perhaps because of this, she was honored by the presence of several dignitaries aboard her: an Assistant Secretary of the Navy, a member of the United States House of Representatives, Admiral Robert E. Keith, and the

Reserve Division Commander, Captain W. T. Thomas. Upon the conclusion of the training exercises, Captain Thomas instructed Commander Allen to return the DARBY to Little Creek, Virginia, her port, as quickly as she could proceed; the instruction was given in general terms, and Captain Thomas did not mention a particular speed. Thus, under the control of Commander Allen, the DARBY steamed toward the Chesapeake Bay.

Approximately one hour prior to the collision, with her navigational lights exhibited, Commander Allen ordered the DARBY to a course of 266° and a speed of 19 knots. This course and speed were maintained until only a very short while before the collision and would have taken the DARBY to a point just north of Little Creek. On the various bridges of the DARBY, as she was proceeding inbound, was a full complement of crewmen: Commander Allen; the Navigator, Lieutenant Wilfred J. Loggan; the Navigator's Quartermaster, Guy T. Costa, QM 1; the Officer of the Deck, Lieutenant George E. Scheufele; the Junior Officer of the Deck, Lieutenant (j.g.) Thomas J. Doud, Jr.; a Lookout, Edgar F. Manning, Jr., SR; a Talker; two Helmsmen; and others. Approximately twenty persons were on the bridges of the DARBY during the twenty minute period immediately preceding the collision.

On the morning of the day in question, the SOYA ATLANTIC departed Baltimore for Puerto de Hierro, Venezuela. The vessel was in ballast. Her Captain was Runar K. Bakke, the holder of a Swedish Master's License who then had been in command of the SOYA ATLANTIC for a period of three years. During this period, Captain Bakke had navigated in the mouth of the Chesapeake Bay upon numerous occasions—sometimes as often as twice a month—and under varying conditions. He was quite familiar with the area.

On March 19, Captain Bakke relinquished control of his ship to pilot, William G. Anderson, for the trip down the Bay from Baltimore. During this uneventful trip, Anderson directed that the navigational lights be turned on; the order was carried out, for the lights subsequently were checked and found to be burning by Anderson, Captain Bakke, and Chief Officer Alphonse Leman. The SOYA ATLANTIC arrived at the mouth of the Bay at about 1935. While the vessel was slowing down, so that Anderson could disembark, he pointed out to Captain Bakke all of the traffic in the vicinity. Among the ships visible and observed by Captain Bakke at this time was that which later proved to be the DARBY; she was about four to six miles on the SOYA ATLANTIC's port side at a bearing of 60° to 80° relative. By the time the "briefing" was concluded, the SOYA ATLANTIC had reached a point midway between Buoys 1TH and CH, near the latter of which the Maryland Pilot Boat was anchored. To form a lee for Anderson's small launch, the ship had assumed a heading of 160° and had reduced her headway to about one knot. Chief Officer Leman and the sole lookout went off the bridge to assist in the disembarkation, and Anderson left the SOYA ATLANTIC at 1940.[2] Shortly thereafter, Leman returned to the bridge to rejoin Captain Bakke, who had assumed control of the ship, and the helmsman. However, the lookout never resumed his position prior to the collision.

At 1940, Captain Bakke ordered hard left rudder from the helmsman and telegraphed the engines to full ahead. This course alteration was necessary because the SOYA ATLANTIC's previous heading of 160° would have taken her inside Buoy C"1" and too close to Cape Henry. Shortly thereafter, when the ship had responded to Captain Bakke's rudder order, he directed the helmsman to steady the wheel and asked him what course heading the ship had assumed. The answer was 115°, and, by checking his radarscope, Captain Bakke ascertained that this heading would have taken the SOYA ATLANTIC too close to Buoy 2A. Re-

2. This was the SOYA ATLANTIC'S bridge time, as well as the time according to Anderson's wristwatch.

sponding to the danger, Captain Bakke ordered the helmsman to a course of 125°, and the order was carried out.

At about 1943, just after the Chief Officer had returned to the bridge, Captain Bakke observed an inbound ship to the south of the SOYA ATLANTIC, in the vicinity of Buoy 2CB. This vessel had her red navigational light showing, indicating that she and the SOYA ATLANTIC were on crossing courses. Under such circumstances, the SOYA ATLANTIC was the burdened vessel and obliged to alter her course to allow the other vessel unobstructed passage. At 1945, this obligation was satisfied, Captain Bakke ordering his ship to a course of 134°. This action, in terms of the Captain's navigational plan, was premature. As was his custom, Captain Bakke was running from buoy to buoy. He had intended to assume a heading of 134°, the approximate bearing of Buoy 2CB from Buoy 2A, when within half a mile of the latter buoy; however, because of the presence of the inbound ship, this heading was ordered sooner than was anticipated. It is interesting to note that the inbound ship was never seen again, but this fact is not of great moment; more immediate dangers were to arrest Captain Bakke's attention.

The SOYA ATLANTIC remained on her course heading of 134° from 1945 until about 1951. Under her Captain's engine order of full ahead, she constantly was accelerating in speed from one knot, at 1940, to about ten or twelve knots, at 1951. During this entire period, Captain Bakke had the inbound DARBY under observation. Admittedly, the Captain took only visual bearings and was concerned with several other chores, but that he did watch the DARBY is not open to serious doubt.[3] At first, with his binoculars and later with his naked eye, Captain Bakke saw that the DARBY was exhibiting two white range lights and her green side light. On the basis of this information and the bearing of the DARBY relative to the position of the

SOYA ATLANTIC, Captain Bakke correctly surmised that the two vessels were on crossing courses and that the SOYA ATLANTIC was the privileged or holding-on vessel. However, because of the DARBY's speed and the lowness of her navigational lights with respect to the water, Captain Bakke took her to be a fishing vessel of little draft. Having previously encountered other fishing vessels in this area, he assumed that this "fishing vessel", as the others had done in the past, would alter her course to starboard and avoid the SOYA ATLANTIC by going north of Buoy 2A. Although the DARBY was not a fishing boat, it nonetheless was quite capable of the maneuver anticipated by Captain Bakke. The minimum water depth north of Buoy 2A is twenty feet, and the DARBY's draft, as already has been stated, is only twelve feet. Moreover, the DARBY is highly maneuverable. At nineteen knots, she is capable of executing a 90° turn with an advance of less than 375 yards and a transfer of less than 175 yards, and her tactical diameter at nineteen knots is less than 370 yards.

At 1950, the SOYA ATLANTIC passed abeam of Buoy 2A and Chief Officer Leman notified the engine room that she had begun her sea voyage. Immediately thereafter, both Captain Bakke and the Chief Officer became increasingly concerned because of the rapidity with which the DARBY continued to close in on their vessel. After the SOYA ATLANTIC had assumed her heading of 134°, the relative bearing of the DARBY remained roughly constant, varying only slightly because of the SOYA ATLANTIC's steady acceleration. It was obvious to Captain Bakke and his Chief Officer that the two vessels were on collision courses. Yet, despite the clarity of the situation, the DARBY, the burdened vessel, maintained both her heading and her speed. The only reasonable conclusion is that, prior to 1950, no one responsible for the navigation of the DARBY saw the SOYA ATLANTIC and correctly identified her

3. This conclusion is contested by the government and is discussed at length in Part IV of this opinion.

course and relative bearing. Those crowding the bridge of the DARBY, preoccupied with other phases of her navigation, either failed to observe the SOYA ATLANTIC or did observe her but failed to appreciate the dangers created by her presence.

On this point, the testimony of the various crew members aboard the DARBY is not very helpful. Commander Allen claimed that the ship later discovered to be the SOYA ATLANTIC was first seen by him in the vicinity of Buoy CH, at a relative bearing of 10° to the DARBY's starboard and at a distance of about four miles. He did not see any navigational lights, but only a cluster of what he took to be porthole and deck lights. He inquired of the radarman if there were any moving "targets" in the area in question, and the response was in the negative. The radarman then was told to notify the bridge of moving targets only; he never identified the SOYA ATLANTIC on his 'scope and he never gave another report prior to the collision.[4] After further consultation with other men on the bridge, Commander Allen concluded that the SOYA ATLANTIC was a ferry crossing from the south to the north side of the Bay—despite the fact that he knew that no ferries navigated within five miles of Buoy CH. Commander Allen went on to testify that these lights moved from a relative bearing of 10° to starboard, at first sighting, to a relative bearing of 45° to starboard, when they steadied with about a mile of water separating the two vessels. On the basis of these alleged observations, Commander Allen concluded that the SOYA ATLANTIC would have free passage to the stern of the DARBY.

The testimony of others aboard the DARBY was to the same effect. For instance, the forward lookout, Edgar F. Manning, Jr., stated that he first saw what he thought were the porthole lights of the SOYA ATLANTIC at a distance of about two miles and that these lights moved aft to a relative bearing of about 45°. As did Commander Allen, Manning concluded that the SOYA ATLANTIC would pass well astern of the DARBY. To say that he was an inexperienced and ill-trained lookout is a harsh but indisputably accurate judgment. Manning had stood lookout watch four times and could not remember ever having had such a watch at night. He did not know what a compass point is, or how many degrees there are from bow to beam, or what range lights are, or what side lights are, or how to distinguish buoy lights from ship lights. He did not even know how to communicate properly with those on the bridge below where he was stationed. Manning claimed to have reported his nebulous observations to the bridge by 'phone but receipt of his report was never acknowledged. He continued to scan the horizon and the next time he looked to starboard, the SOYA ATLANTIC was almost upon the DARBY.

Neither the testimony of Commander Allen nor that of Manning is credible, for it hypothesizes a set of circumstances under which the accident almost certainly could not have occurred. Prior to these events more immediately preceding the collision, the SOYA ATLANTIC had attained a speed of not more than, and probably less than, twelve knots. It is undisputed that, at the same time, the DARBY was proceeding at a speed of nineteen knots. With these additional facts, let us momentarily assume the correctness of Commander Allen's statement that the lights of the SOYA ATLANTIC moved aft of the DARBY, to a relative bearing of 45°, when the two vessels were 2000 yards apart. At this sighting distance, the SOYA ATLANTIC would have been 1900 yards from the intersection of the projected course lines of the two vessels, while the DARBY

---

4. At the time of collision and for some time prior thereto, the DARBY's radarscope was set at a range of seven miles. Although the matter was not developed at trial, it would be most surprising if the 'scope could not have been set at a lesser range of two or three miles. If the DARBY's radar equipment had such capabilities, it is not understood why they were not employed as she was moving into the confined and congested waters at the mouth of the Chesapeake Bay.

would have been only 144 yards from the intersection. And it would have taken the SOYA ATLANTIC more than twenty times longer to reach the intersection than it would have taken the DARBY. Thus, under Commander Allen's statement of the facts, the DARBY easily could have passed in front of the SOYA ATLANTIC, and she could have done so without the slightest risk of collision. The circumstances related by Commander Allen are implausible, and they would be implausible even if it were assumed, as is more likely, that the sighting distance was only 500 yards, rather than 2000 yards. Regardless of the actual distance separating the two vessels, with the relative bearing of the SOYA ATLANTIC from the DARBY steady at 45°, the DARBY always would be more than ten times closer than the SOYA ATLANTIC to the intersection of their respective projected course lines and advancing on that position at almost twice the speed. This point is illustrated geometrically— and, perhaps, more clearly—in the margin.[5]

The only reasonable conclusion is that those aboard the DARBY did not observe and correctly identify the SOYA ATLANTIC until the danger of collision was imminent. Commander Allen must not have seen the SOYA ATLANTIC until she was almost upon his ship and when, regardless of estimated relative bearings, the risk of collision was patent. Most credible on this point was the testimony of the DARBY's experienced navigator, Lieutenant Loggan, who stated that the SOYA ATLANTIC was not observed and correctly identified until it was only 400 yards away.

Within a minute after 1950, when less than a quarter of a mile of water separated the two vessels, the SOYA ATLANTIC sounded a four-whistle blast, the danger signal, and Captain Bakke telegraphed all engines stopped. During the same brief instant, the DARBY also sounded the danger signal. By this time, Commander Allen had discovered the SOYA ATLANTIC, had seen her range and side lights, and had correctly ascertained that she was the privileged vessel in a crossing situation. So, shortly after the sounding of the danger signals, Commander Allen ordered all engines stopped and, moments later, left full rudder

5. Assuming that the SOYA ATLANTIC (S) were at a relative bearing of 45° (/D) from the DARBY (D), a triangle formed by the SOYA ATLANTIC's course line of 134° (SX) projected to its intersection with the DARBY's projected course line of 266° (DX) and the actual or sighting distance between the two vessels (SD) would look like this:

If the actual or sighting distance (SD) were 2000 yards, the SOYA ATLANTIC's distance from the point of intersection (SX) would be 1900 yards, while the DARBY's distance from the point of intersection (DX) would be only 144 yards. If the actual or sighting distance (SD) were 500 yards, the SOYA ATLANTIC's distance from the point of intersection (SX) would be 483 yards, while the DARBY's distance from the point of intersection (DX) would be only 31 yards. Regardless of the sighting distance (SD), in the time it would take the SOYA ATLANTIC to reach the point of intersection the DARBY would travel far beyond it (to D').

and all engines back full. The rudder order is somewhat surprising. The DARBY, of course, had the duty of passing aft of the SOYA ATLANTIC. However, the left rudder command took the destroyer escort in front of the Swedish ship, rather than behind. Why a right rudder order was not given is unclear. Possibly Commander Allen thought that the DARBY would have been unable to execute a starboard turn without either hitting the SOYA ATLANTIC or running down Buoy 2A and a neighboring obstruction buoy. If such was the Commander's navigational impression, its correctness is thrown in doubt by the maneuvering capabilities of the DARBY set forth above. A more likely inference is that Commander Allen thought that the left rudder order would afford the SOYA ATLANTIC greater distance within which to stop. But, by the time the DARBY commenced execution of her captain's rudder and engine orders, only seconds after the exchange of danger signals, she already was within less than 300 yards of the point of collision, and the SOYA ATLANTIC was within less than 500 yards of the point of collision.[6]

Almost immediately after the exchange of danger signals, Captain Bakke ordered hard right rudder, upon the sounding of a single whistle blast. Presumably, this maneuver was executed to give the DARBY increased sea room for passage to the stern of the SOYA ATLANTIC. The signal, of course, was inappropriate.

6. These findings, as to the DARBY, are based upon the undisputed facts that the DARBY's stopping distance at nineteen knots is considerably less than 300 yards—actually, closer to 250 yards—and that she was virtually dead in the water at the time of collision. As to the SOYA ATLANTIC, assuming Captain Bakke's stop order was given about one and a half minutes before the collision and the SOYA ATLANTIC's mean speed from that moment until impact was ten knots (a generous estimate), her straight line distance traveled in that time interval would have been 500 yards. That these engine orders of the two captains were carried out within a minute and a half of the collision is all but certain. Given the DARBY's amazingly short stopping distance, she must have been able to reach her dead-in-the-water position within that time.

Of course, the above calculations are based upon a finding that the avoiding actions of the two vessels were commenced almost simultaneously. The government does not dispute this, but claims that these events occurred considerably earlier and with greater distance separating the two vessels. For the reasons already set forth in the main body of this opinion and because of the obvious stopping capabilities of the DARBY, this contention has been rejected. On the other hand, proctors for the SOYA ATLANTIC have pressed upon the court the proposition that the DARBY's avoiding actions—at least her left rudder and full astern orders—were commenced more than a minute after the exchange of danger signals, whereas the SOYA ATLANTIC's engines were stopped immediately. The court has rejected this contention also. The evidence strongly indicates that the avoiding commands were given at approximately the same time and that the collision occurred not more than two minutes after the SOYA ATLANTIC passed abeam of Buoy 2A. When abeam of that buoy, the SOYA ATLANTIC admittedly was almost exactly a half a mile from it, and the point of collision likewise was approximately a half a mile from said buoy. A collision time later than 1952—that is, more than two minutes after the SOYA ATLANTIC's passing abeam of Buoy 2A —would make this latter distance considerably greater. However, the court is more convinced of the correctness of the distance estimates than of the time estimates. The collision time of 1953 entered in the SOYA ATLANTIC's log was not an observed time, but one approximated after the collision. In view of the obvious excitement immediately preceding and following impact, all impressionistic estimates of time intervals during that period must be viewed as highly unreliable. There is no serious dispute that the danger signals were given by the vessels almost simultaneously, and the court finds little ground for doubting that both ships took avoiding action almost immediately thereafter.

The estimates of distance at the time of taking avoiding action—300 yards for the DARBY and 500 yards for the SOYA ATLANTIC—are maximum. In view of Lieutenant Loggan's testimony with respect to the DARBY's stopping distance and the time of sighting the SOYA ATLANTIC, both distances were almost certainly less than as found above.

Under the Inland Rules, a single blast indicates that a vessel is holding its course; under the International Rules, it indicates the action actually taken. As already has been stated, both vessels, at the time the single blast was sounded, were in waters where the Inland Rules applied. However, no one on the bridge of the DARBY heard this improper signal, and it went unanswered.

Moments before the collision, both vessels still were being carried forward by their momentum: the DARBY to her port across the bow of the SOYA ATLANTIC and the SOYA ATLANTIC to her starboard. With the distance between the two vessels steadily diminishing, both captains thought it possible for the DARBY to clear the SOYA ATLANTIC's bow. Aboard the SOYA ATLANTIC, Captain Bakke ordered the rudder hard left and the engines half astern; and, almost immediately thereafter, an engine order of full astern was telegraphed. These commands were carried out a minute before impact. Aboard the DARBY, Commander Allen telegraphed his engines full ahead, but this command never was executed. Although the SOYA ATLANTIC had moved to port, almost to her original course line of 134°, the two vessels collided at about 1952. The DARBY was virtually dead in the water when the bow of the SOYA ATLANTIC pierced her starboard side about 75 feet forward of her stern, in the vicinity of the crew's quarters. At the time of the collision, the SOYA ATLANTIC still had a headway of about eight knots, and her penetration was through more than half the width of the DARBY. The angle of collision formed by the starboard sides of the two vessels was almost a right angle. After impact, the SOYA ATLANTIC stood by to render any necessary assistance.

Killed in the collision were two seamen aboard the DARBY, Thomas Edward Johnson and Charles Edward Crandell.

## II

■ There are two factual assertions forwarded by the government which the court specifically rejects. First, it is the government's contention that the navigation lights of the SOYA ATLANTIC were not turned on until 1950, when she came abeam of Buoy 2A and when her navigators realized that those aboard the DARBY must not have been able to see her. It was the corroborated testimony of a most disinterested witness, Pilot Anderson, that he ordered these lights turned on considerably earlier in the evening. Anderson himself subsequently checked them, and they were checked, also, by Captain Bakke and Chief Officer Leman. In view of this testimony, the court is of the opinion that the testimony of Commander Allen and others aboard the DARBY, to the effect that the SOYA ATLANTIC's navigational lights were not seen until only a few minutes before the collision, is more probative of the proposition that the DARBY had a defective lookout than of the proposition that the SOYA ATLANTIC was unlighted. Commander Allen's own testimony was that, when he first saw the SOYA ATLANTIC, 1500 to 2000 yards away, he saw her lights and, more particularly, he realized that a crossing situation was presented.

■ Second, it is the government's contention that the SOYA ATLANTIC did not set its course of 134° until 1950, when it was abeam of Buoy 2A, rather than at 1945.[7] Obviously, this assertion is not based upon any visual observations by DARBY crew members; it is founded upon Captain Bakke's candid testimony with respect to the common practice of running the buoys. He stated that the SOYA ATLANTIC's course of 125° was intended to take her within a half mile of Buoy 2A and that, when she passed abeam of Buoy 2A on her course of 134°, the buoy was almost exactly a half mile off. In the light of all of the other evi-

---

7. In its attempt to establish this point, the government sought to prove that the SOYA ATLANTIC, as the holding-on vessel, breached her duty to maintain her course.

dence, these facts strike the court as mere coincidence. It seems to explain only why the heading of 134°, and not some other heading, was assumed at 1945. The 125° heading, which appears to have been selected in a much more random manner, conceivably could have taken—and probably would have taken—the SOYA ATLANTIC to a point not only within a half mile of Buoy 2A, but also considerably closer. The 125° heading could have taken the SOYA ATLANTIC to a point within a half mile circle of Buoy 2A and through that circle as well. On the other hand, the 134° heading must have taken the SOYA ATLANTIC on a course tangential to the half mile circle and not through it.[8]

### III

■■ It is undeniably clear that the SOYA ATLANTIC and the DARBY were on crossing courses, with the former to starboard of the latter. In such a situation, the DARBY was the burdened or giving-way vessel. Hers was the duty of keeping out of the way of the SOYA ATLANTIC. In meeting this obligation, the DARBY should have avoided crossing in front of the SOYA ATLANTIC, if possible, and should have slackened her speed, or stopped, or reversed, if necessary. 33 U.S.C.A. §§ 204, 207, and 208. None of these specific duties was met in

a timely manner. Of course, why they were not met is obvious. The DARBY's lookout was inexcusably defective. Having found, as a matter of fact, that the SOYA ATLANTIC was properly lighted, this court is firmly of the opinion that the DARBY's failure to observe and correctly identify the SOYA ATLANTIC—the DARBY's failure timely to appraise what so clearly was a crossing situation involving risk of collision—was unjustifiable and a clear cause of the collision. The SOYA ATLANTIC should have been identified long before she was identified. Had she been identified when she should have been identified, the DARBY safely could have taken avoiding action and she could have done so without the necessity of reversing. As a matter of fact, had the DARBY taken avoiding action even at the sighting distance of 2000 yards claimed by Captain Allen, she could have passed well aft of the Swedish vessel. The SOYA ATLANTIC should have been seen at a much greater distance. Admiral Keith testified that, under the nighttime conditions existing on March 19, the "loom" of an unlighted vessel of the SOYA ATLANTIC's size could have been spotted, by an experienced lookout, when two miles off. Pilot Anderson testified that, under the same conditions, the SOYA ATLANTIC, if lighted, could have been spotted when five miles off. How-

8. Again, a geometric representation of this point might prove helpful:

2A 1/2 mile

N

125°

134°

ever, the DARBY's forward lookout was not experienced; he was an ill-trained novice. The radarman provided no greater assistance, though perhaps through no fault of his own. And those others on the bridge of the DARBY failed to satisfy adequately those responsibilities which, primarily, were the lookout's. The alleged identification of the SOYA ATLANTIC as a ferry is utterly incomprehensible, and it was reckless of the DARBY to proceed upon such an assumption.

█ The DARBY's wholly defective lookout prevented her from avoiding collision by slackening speed or by stopping and reversing. Had her lookout been competent, she certainly would have seen the SOYA ATLANTIC in sufficient time to take the necessary avoiding measures. Instead, the DARBY pressed on and attempted the highly unorthodox maneuver of turning to port and in front of the oncoming privileged vessel. This final error of judgment cannot be excused as one made *in extremis,* for that doctrine is not applicable to a situation such as this, where a vessel is placed in a position of danger through her own fault. Griffin on Collision, § 233 (1949).

██ In addition to these faults, the DARBY is culpable, also, for traveling at the excessive speed of nineteen knots. The waters off Cape Henry are busy and often congested. One need not be familiar with the inordinate volume of cases arising out of collisions in that area to realize that navigation there demands the greatest prudence and the most competent seamanship. In setting the DARBY's speed at nineteen knots—almost twice that probably attained by the SOYA ATLANTIC—Commander Allen

exercised faulty judgment. The government has sought to dissuade the court from this conclusion by emphasizing the DARBY's high degree of maneuverability.[9] However, this is only one of many factors relevant in determining whether, in a given case, a ship's rate of speed was or was not so excessive as to constitute negligence. "Speed is clearly relative to the situation of the ship; what is proper at sea is ordinarily improper in a harbor, and one harbor speed should differ from another." Learned Hand, J., in the George H. Jones, 27 F.2d 665, 667, 1928 A.M.C. 1504 (2nd Cir. 1928), certiorari denied 278 U.S. 649, 49 S.Ct. 83, 73 L.Ed. 561 (1928). Acknowledging, as one must, the DARBY's excellent maneuverability, several other factors depreciate the value to be attached to this. It was nighttime, and the DARBY's short-range radar reception was impaired. The waters wherein the DARBY was proceeding were heavily trafficked, and it was the first time Commander Allen had navigated there after dark. Vessels were approaching from almost every point of the compass; many of them were stopping either to take on or to discharge pilots, and such maneuvers frequently require erratic navigation. Under these circumstances, the DARBY's great speed seriously interfered with her crew's understanding correctly the navigational situations confronting her. Moving rapidly in these busy and confined waters, all the more treacherous because of the large number of buoy and background lights, the DARBY lost much of that time so precious in determining which vessels were moving and which were not moving, and, as to those which were moving, their courses and speeds. Amid such a tangle of ship-

9. Also in defense of the DARBY's speed, the government has attacked the speed of the SOYA ATLANTIC. However, in this regard, the government does not seriously contend that the SOYA ATLANTIC was negligent with respect to her speed. Were such an argument made, it would be rejected. The SOYA ATLANTIC attained a speed no greater than twelve knots. She was moving out of congested waters, not into them, and had the dark, open sea before her. Under these circumstances, it cannot be said that she was negligent. In her case, as in that of the DARBY, the sole factor of maneuverability should not be considered to the exclusion of all other factors. And, considering all of the factors, the court is of the opinion that the speed of the SOYA ATLANTIC was reasonable.

ping, the DARBY should have foreseen that the only safe course was to move at a speed more moderate than that at which she had been traveling on the open seas for almost an hour prior to the collision.

"The Shadwell [— and this language is applicable to the DARBY —] was at fault in approaching this busy intersection off Cape Henry at flank speed, when it was known, or should have been known, that both inbound and outbound vessels would be encountered from many different directions, and that these vessels would be maneuvering to pick up, or discharge their pilots. Such a situation was fraught with danger and required the careful navigation of an experienced mariner." Nicolas Eustathiou & Co. v. United States, 178 F.Supp. 33, 40 (E.D.Va.1959).

The government has sought to convince the court that the DARBY satisfied all of those obligations upon her by reaching a dead-in-the-water position by the time of impact. This argument is founded upon the assumption that the exchange of danger signals altered the duties of the DARBY from those incumbent upon any burdened vessel in a crossing situation to a simple single duty of stopping in the shortest possible time and distance, which duty is claimed to have been met. This assumption is erroneous. Long prior to the exchange of danger signals, the relative positions of the two vessels clearly placed them in a crossing situation. It was this situation that determined the consequent rights and obligations of the DARBY, and they were not altered by any subsequent events. Griffin on Collision, § 22 (1949). The DARBY, initially, was at fault in creating a situation in which the exchange of danger signals became necessary. For a considerable while before the sounding of these signals, the DARBY was under a duty to avoid the risk of collision. This she did not do. Her actions, and her actions alone, thrust both vessels into a position of peril which it was her duty to have averted in the first instance. It would be unthinkable to exonerate her from her initial faults merely because she might have extricated herself from this peril, whereas the other vessel could not. The DARBY was obliged to avoid the SOYA ATLANTIC, and this obligation remained with her until the moment of impact. The danger signals did not reduce the obligation; if anything, they made it more imperative. Nonetheless, the obligation was never satisfied. The DARBY may have come to a complete stop at the time of collision, but she did so directly in the path of the SOYA ATLANTIC.

The government finally has sought to exculpate the DARBY on the basis of the alleged fact that the SOYA ATLANTIC's relative bearing did not remain constant, but increased from $10°$ to $45°$. It is argued that the increase in bearing indicated that the SOYA ATLANTIC had free passage to the stern of the DARBY, and, therefore, the situation did not involve risk of collision. For the reasons previously set forth, the court is of the opinion that the testimony with respect to increased bearings does not represent the true facts. In addition, at closing argument, proctors for the SOYA ATLANTIC proffered two charts which demonstrate rather convincingly that the relative bearing of each vessel from the other, in fact, did remain roughly constant. Certainly, subsequent events irrebuttably gainsay the conclusion that there was no risk of collision. Regardless, the government's argument misapprehends the purport of the rule regarding the danger of collision if the bearing of a vessel remains constant. 33 U.S.C.A. § 201.

"[It] is not a rule of navigation, but merely a suggestion of one method of determining a risk of collision from a particular compass bearing of an approaching vessel. It does not determine or assume to suggest that all other compass bearings involve no risk of collision, nor does it suggest the only method of determining a risk of collision under the conditions mentioned. Manifestly, vessels approaching each other at

about the same time on crossing courses, with compass bearings gradually changing, involve the risk of collision in the highest degree. It is only when the bearings alter quickly, and the vessels are a considerable distance apart, that there is no risk of collision." Wilder's S. S. Co. v. Low, 112 F. 161, 166 (9th Cir. 1901)

Because of the propinquity of the SOYA ATLANTIC when she was first sighted and because of her gradual acceleration, relative compass bearings must have been a somewhat unreliable guide in determining whether or not there was risk of collision—although not so extremely unreliable as is suggested by the unbelievable testimony of Commander Allen. In any event, if the DARBY relied upon this guide at all, she should not have relied upon it to the exclusion of all others.

## IV

Having considered the faults of the DARBY, we now shall turn to a closer consideration of the alleged statutory faults and acts of negligence of the SOYA ATLANTIC. Several of these charges already have been touched upon.

First, the government contends that the SOYA ATLANTIC was guilty of a statutory fault in failing to maintain proper navigational lights and in failing to turn them on until she passed abeam of Buoy 2A. Having found, as a matter of fact, that the SOYA ATLANTIC's lights were turned on and burning brightly considerably earlier in the day of the collision, this contention is without merit.

Second, the government claims that the SOYA ATLANTIC was guilty of a statutory fault in failing to have a proper lookout. In so saying, the government points to the facts that: (1) the SOYA ATLANTIC's sole lookout left the bridge to assist in the disembarkation of the pilot and never returned; (2) those remaining on the bridge were preoccupied with other navigational duties; (3) no one aboard the SOYA ATLANTIC took bearings on the DARBY by pelorus, bearing circle, or radar; (4) both Captain Bakke and Chief Officer Leman were moving between well lighted and darkened portions of the bridge; (5) Captain Bakke improperly identified the DARBY as a fishing boat;[10] and (6) Captain Bakke had a minor eye defect.[11] Many of these alleged facts are true, and the practices which they suggest are to be decried. However, in view of the credible affirmative testimony given by the Captain and the Chief Officer, the court is convinced, not only that these faults did not cause the collision, but also that they could not have caused it. In crossing cases such as this, the requirements of a competent lookout and the taking of bearings are insisted upon with respect to the privileged vessel so that she might be prepared to take the proper avoiding action, should the circumstances of the case require it. Curtis Bay Towing Co. v. Sadowski, 247 F.2d 422 (4th Cir. 1957), modifying and remanding 147 F.Supp. 869 (D.Md. 1957); Osaka Shosen Kaisha, Ltd. v. The Elene (Angelos, Leitch & Co., Ltd.), 190 F.Supp. 201 (D.Md.1961), affirmed in part and reversed in part 301 F.2d 59

---

10. In this connection, the government has cited United States v. S. S. Washington, 241 F.2d 819 (4th Cir. 1957), certiorari denied Texas Co. v. United States, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34 (1957), presumably for the proposition that such an improper identification, in itself, is sufficient to establish negligence. The case does not so hold. Here, in view of the DARBY's exceptional maneuverability and her capability of performing the action anticipated by Captain Bakke, the error in identification is of no consequence.

11. According to the results of an eye examination of Captain Bakke conducted during the course of the trial, his uncorrected vision—he was not wearing glasses on the night of the collision—presently is 20/40 in the right eye and 20/50–1 in the left eye. Tests disclosed that his ocular system is completely normal and his visual acuity under poor light is also normal. It is difficult to imagine that such inconsequential eye defects could have prevented Captain Bakke from seeing an object as large and as well lighted as the DARBY.

(4th Cir. 1962). Here the SOYA AT-LANTIC took those avoiding actions, despite the absence of a specially assigned lookout and despite the failure to take bearings. And, even before the time for avoiding actions arrived, all that was fairly observable by the navigators of the SOYA ATLANTIC was observed. Neither a lookout without other duties nor the taking of bearings by pelorus could have accomplished more than Captain Bakke accomplished with his binoculars and his naked eye. Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., supra, 301 F.2d at p. 61. In brief, the government, by establishing the facts enumerated above, merely has proffered an explanation for a conclusional fact which the court explicitly rejects. The government's evidence would explain most satisfactorily, had the DARBY not been observed, why she was not observed. However, we are convinced that the navigators of the SOYA ATLANTIC spotted the DARBY at the time of the pilot's disembarkation and kept her under adequate observation from that time until the moment of collision.

 Third, the government urges that the SOYA ATLANTIC was negligently operated because Captain Bakke was ignorant of her operating characteristics. This claim is premised upon Captain Bakke's remarkably candid testimony that he did not know the SOYA ATLANTIC's stopping distances at various speeds, her advance and transfer in turning, and so forth. These admissions impressed the court that the Captain was incompetent no more than the development of comparable facts in a simple automobile case would impress it. Granted, a master is under a duty to know the operating characteristics and maneuvering capabilities of his vessel, but this does not mean necessarily that he must be able to recite them with mathematical preciseness. A mariner may not be able to express in terms of yards the distance within which his vessel can be stopped

under certain stated conditions. Yet, he still may be capable of exercising perfectly accurate judgment when out of the witness chair and on the bridge, actually confronted by the situation hypothesized in the courtroom. The experience is quite common, and a judge observes it almost weekly. An automobile driver may grossly underestimate the stopping distance of his vehicle at a stated speed, when speaking of it in feet; nevertheless, he might operate his vehicle for a lifetime without incident. A master must know his ship, but to say that he does not know her in feet and inches is not to say that he knows her not at all. In the instant case, the court is satisfied that the charge of Captain Bakke's incompetency is without valid substance and that his unfamiliarity with his vessel in mathematical terms did not contribute to cause the collision.

 Fourth, the government claims that the SOYA ATLANTIC, as the holding-on vessel, was guilty of a statutory fault in failing to maintain both her course and her speed. It is in this connection that the government has insisted that the SOYA ATLANTIC did not assume her course of 134° until 1950, when she was abeam of Buoy 2A. This factual claim has been rejected by the court. Instead, it has been found that the 134° heading was assumed at 1945, approximately seven minutes before the collision and when the two vessels were more than two miles apart. Furthermore, the SOYA ATLANTIC's previous course of 125° had been maintained for almost five minutes before 1945, and the alteration of heading at 1945 was only 9°; it was made for the sole purpose of yielding the right of way to an inbound ship coming up from Buoy 2CB. Assuming arguendo that the duty to maintain course and speed had attached to the SOYA ATLANTIC by the time she made this alteration and that this duty was breached,[12] the language of Judge Chase, speaking in The Steel Inventor, 43 F.2d

---

12. A respectable argument could be made that so slight a change of heading, effected at the time and under the circum-stances found here, did not constitute a fault. See The William J. Riddle, 102 F.Supp. 884 (S.D.N.Y.1952), affirmed

958, 960–961 (2nd Cir. 1930), certiorari denied 283 U.S. 819, 51 S.Ct. 344, 75 L. Ed. 1435 (1931), is singularly apt.

"She [the Steel Inventor] established her new course on a definite basis under the starboard hand rule so long before the Woolsey was called upon to act because of the change that, whether the Woolsey was placed in the position of the burdened vessel strictly as a matter of right or not, she was in no way embarrassed, and was bound to take notice that she was in fact burdened and to act accordingly. She was a very able ship, of high speed and great maneuvering power. It was then her duty to accept the navigation of the Steel Inventor with whatever it entailed; not to assume that it was so wrong that it would be changed, but to take it for granted that the Steel Inventor would keep her course and speed as the rules of navigation required. [citations omitted] Nor was it any excuse for her to proceed on the assumption that the Steel Inventor had already violated the rules of navigation once in changing her course and would do so by changing again. The Woolsey easily could and consequently should have avoided going ahead of the Steel Inventor [citations omitted], and was bound to, 'if necessary slacken her speed or stop or reverse,' [citations omitted]. Having the time and opportunity to do so, it was her duty to keep out of the way. [citations omitted] By keeping right on in the face of the danger which the maintenance of her course and speed increased with every passing minute, she was guilty of such gross violation of the starboard hand rule for so long a time after she could have acted to prevent the subsequent disaster that any doubt as to the wisdom and good seamanship of the Steel Inventor's captain must be resolved in his favor. [citations omitted]"

United States v. United States Lines Co., 200 F.2d 608 (2nd Cir. 1952), exculpat-

In that case, the course change of the STEEL INVENTOR alluded to in the above quotation was made about the same length of time prior to the collision and with about the same distance separating the vessels as in the instant case. Otherwise, the facts there are more extreme than those here. There the two vessels, prior to the course change, were on meeting courses. However, the STEEL INVENTOR's alteration of heading, through more than 20° of the compass, radically changed the navigational picture to a crossing situation and conferred upon her a privileged status which she theretofore did not possess. Here, from the discharge of the pilot down until the moment of impact, it was absolutely clear that the SOYA ATLANTIC and the DARBY were on crossing courses; both before and after the course change, the SOYA ATLANTIC was to starboard of the DARBY, and the SOYA ATLANTIC's change in heading was only a scant 9°. If the SOYA ATLANTIC was guilty of a fault in making this minor change in heading, necessitated by the presence of another vessel in relation to which she was burdened, it was too remote in time to be considered an active cause of the collision. The Steel Inventor, supra; Griffin on Collision, § 45 (1949). After 1945, the DARBY still had considerable time and distance within which to take avoiding action, and her maneuvering capabilities were such that this action alone effectively could have avoided the collision. Of course, there is no merit to the further contention that the SOYA ATLANTIC's continued gradual acceleration constituted a fault that was operative until the exchange of danger signals. The requirement that the holding-on vessel maintain both course and speed demands neither that the course be straight nor that the speed be steady; what is demanded is that both be definite and predictable. As Judge Learned Hand so correctly stated in Commonwealth & Dominion Line, Ltd. v. United States, 20 F.2d 729, 731 (2nd Cir. 1927),

ing a vessel which had changed heading by 5°.

reversed on other grounds 278 U.S. 427, 49 S.Ct. 183, 73 L.Ed. 439 (1929):

"A ship is on a steady course, not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements. A steady course may thus involve many changes of heading; it is enough if these can with accuracy be foretold. If they can, so that at any given time in the future her position can be ascertained, she is on a course, and if that course crosses the course of another vessel, who holds her on her starboard hand, the latter must keep out of her way. Whether the way be sinuous, or the speed variable, makes no difference, so it be plainly disclosed."

With respect to the SOYA ATLANTIC's gradual acceleration, the DARBY should not have been misled. The DARBY was in the vicinity of two pilot stations and in an area where the confined waters of the Chesapeake Bay opened on the high seas. The DARBY's navigators should have been cognizant of the need of vessels to decelerate to pick up and discharge pilots and to accelerate thereafter, particularly with respect to a vessel on a seaward course. Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697 (E.D.Va.1960), affirmed Gratsos v. The Moisie Bay, 287 F.2d 706 (4th Cir. 1961); Nicolas Eustathiou & Co. v. United States, supra.

■■■ Fifth, the government urges that the SOYA ATLANTIC was negligent in ordering her engine room to stand easy when she passed abeam of Buoy 2A. The contention is made on the basis of the testimony of a government expert to the effect that notifying the engine room that a sea voyage has commenced, in ordinary merchant practice, is equivalent to telling such personnel that no more engine orders are expected. Curiously, the government's rigorous cross-examination of the Swedish seamen failed to establish this point. Thus, that notification of the commencement of a sea voyage has the same meaning aboard Swedish vessels as it presumably does aboard American vessels has not been clearly established. Captain Bakke's testimony in this regard—so candid in other matters—suggests that the notification was given, not for the purpose claimed by the government, but solely because of the requirements of the charter party under which the SOYA ATLANTIC was then steaming. In any event, the record is barren of evidence that would indicate an unusual delay between the telegraphing of engine orders from the bridge and their execution. Therefore, the government has failed to establish a causal connection between the notification to which it objects and the collision.

■■■ Sixth, the government contends that the SOYA ATLANTIC was guilty of a statutory fault in failing to put her engines full astern contemporaneously with the exchange of danger signals. As already has been found, the danger signals were sounded within thirty seconds after 1950, whereupon the SOYA ATLANTIC's engines were immediately stopped; within an additional thirty seconds, and about one minute before impact, her engines were turned half astern and then full astern. The government's argument is based upon Pilot Rule 80.7(b), 33 C.F.R. § 80.7(b), which provides:

"(b) If from any causes and conditions covered by this situation [sic] are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

The government does not claim that the SOYA ATLANTIC was obliged to sound her danger signal and take avoiding action herself prior to 1950, and, if the claim were made, it would be rejected. Captain Bakke was obligated to navigate his vessel within the requirements of two seemingly conflicting mandates. On

the one hand, as the holding-on vessel, the SOYA ATLANTIC initially was required to maintain both her course and her speed; she was entitled to assume that the DARBY, as the giving-way vessel, would yield. On the other hand, the SOYA ATLANTIC did not have the right of way into a collision; when it should have become apparent to her that the DARBY no longer could comply with her duty to avoid the SOYA ATLANTIC unaided,[13] the SOYA ATLANTIC then was obligated to take whatever action was necessary to assist in averting the threatened collision.

> "Since it is often a matter of very nice judgment to determine at what precise moment the first obligation ceases and the second and contrary obligation arises, the holding-on vessel may, obviously, be placed in a very difficult position. Consequently, she is entitled to considerable latitude in making her decision and will not be held in fault for a mere error of judgment in resolving a dilemma forced upon her by the fault of the giving-way vessel." Griffin on Collision, § 51(4), at p. 153 (1949).

Captain Bakke commenced to take avoiding actions at a reasonable time, and he did so by sounding the danger signal, and immediately ordering his engines stopped and right rudder. In the hurly-burly of the impending disaster, thrust upon him and his vessel by the gross disregard of the DARBY, it was his initial judgment that no more was required. Such a judgment should not be criticized too readily. Indeed, had the DARBY pressed on at the same speed, as indifferent to the danger

signal as she previously had been to the SOYA ATLANTIC herself, the collision never would have occurred and Captain Bakke's judgment would have been wholly vindicated. Beyond this, the government is incorrect in its fundamental contention that "when a privileged vessel in imminent danger stops engines she must reverse at once. There is no such universal rule." The Arkansan, 112 F.2d 230, 231 (9th Cir. 1940). We are of the opinion that Captain Bakke's error in judgment, if such it was, may be excused because made while *in extremis*. The SOYA ATLANTIC in no way was at fault in creating the emergency in which she found herself, and the error possibly committed was trivial. Under the circumstances, to apply the more onerous doctrine of United States v. S.S. Washington, 241 F.2d 819 (4th Cir. 1957), certiorari denied Texas Co. v. United States, 355 U.S. 817, 78 S. Ct. 21, 2 L.Ed.2d 34 (1957), would be unwarranted and unjust.[14] However, if the court is mistaken in this judgment, it is convinced that Captain Bakke's error in failing to reverse immediately could not have contributed to cause the collision. Admittedly, the Captain himself testified to the contrary. However, other evidence in the case demonstrates convincingly that he has deprecated himself unnecessarily. It is clear that, even if the SOYA ATLANTIC's engines had been put full astern when the danger signal was sounded (that is, thirty seconds prior to the time they actually were put astern), she could not conceivably have stopped within the distance separating her from the DARBY. In fact, the results of her crash stop tests indicate

---

13. At one point, proctors for the government suggested that the rule was otherwise. However, the rule undoubtedly is that the privileged vessel is not required—indeed, not entitled—to take avoiding action until it appears that the burdened vessel, upon whom the primary obligation rests, is unable to avoid collision by her actions alone.

14. In that case, the Fourth Circuit applied the language of Cuba Distilling Co. v. Grace Line, 143 F.2d 499 (2nd Cir. 1944),

certiorari denied 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 624 (1944):

> "[M]en, charged with responsibilities of command, must not be wholly incapacitated for sound judgment when suddenly thrust into peril. Part of their equipment for their duties is some ability to think, be the situation ever so sudden and so grave."

In the case of the S.S. Washington, supra, the culpable vessel took no action whatever until actually in collision. Such is not the case here.

strongly that her speed ahead one minute after the order to reverse would be approximately the same as at one and a half minutes after the order. However, let us assume that had the SOYA ATLANTIC reversed her engines immediately, the DARBY would have had an additional thirty seconds within which to act. Various of the DARBY's engineers estimated that it would take from ten to thirty seconds for her to carry out an order of full astern from full ahead; obviously, it would take the same time to do the reverse. So, allowing for the time necessary to execute Commander Allen's last order of full ahead, which went unanswered, the DARBY would have had to travel forward more than twenty-five yards (the distance of the point of impact from her stern) in no more than twenty seconds. And, to move forward the required distance in the available time, the DARBY would have had to attain a *mean* speed of slightly more than eight knots. Of course, to attain this *mean* speed, the DARBY's actual speed at the end of the twenty second period would have had to have been considerably greater. Because of her tremendous inertia when dead in the water (her position at the actual moment of impact), we are convinced that it would have been impossible for her to achieve such speeds. Therefore, had Captain Bakke put the SOYA ATLANTIC's engines full astern at the same time he sounded the danger signal, the collision still would have occurred.[15]

Seventh, the government had contended that the SOYA ATLANTIC was at fault in inappropriately sounding a one-whistle blast when altering her course to starboard. When it was developed at trial that this signal was not heard by, or reported to, anyone on the bridge of the DARBY, this contention, quite properly, was abandoned. Nicolas Eustathiou & Co. v. United States, supra.

■ Finally, the government claims that alterations and erasures in the log of the SOYA ATLANTIC cast suspicion upon her entire case. A government expert testified that three entries in the Swedish vessel's rough deck log, posted immediately after the collision, appeared over obliterations made by a simple pencil eraser; what the original entry was, in each instance, the expert was not prepared to state. The government's argument correctly presents the rule with respect to log alterations, but the rule is not applicable where, as here, the alterations are satisfactorily explained. The first erasure, made by Chief Officer Leman, was of the same information that was written over it, and the erasure was made solely because of insufficient space within which to write. The second erasure pertained to the time of collision, and also was made by the Chief Officer. He admitted that he did not remember the change, but, as the logged collision time was only an estimate and not an observed time, the alteration is of little consequence. The Chief Officer was so candid in his testimony with respect to erasures that he acknowledged an additional alteration not even identified by the government expert. Immediately opposite the logged collision time appears the word "kolliderat" ("hit and damaged") which was substituted for the word "stöttepö" [?] ("hit, but not necessarily damaged"). The third alteration was made by Captain Bakke, and he testified that the material erased had no relation to the navigation of the ship, but was an irrelevant marginal note. The word under which the erasure appears is "strax" which simply means "soon after." All of

15. If it is assumed that, had the DARBY additional time, she would not have put her engines full ahead, she then would have had to travel backward more than seventy-five yards in no more than thirty seconds. To do this, she would have had to attain a mean reversing speed of approximately six knots and, of course, an actual speed at the end of the thirty second period that would have been considerably greater. Because of both inertia and the great water resistance when moving backward, we are convinced here, too, that it would have been impossible for the DARBY to achieve such speeds.

these changes appear to be innocent and, probably, are most adequately explained by the turmoil and haste immediately following the collision.

## CONCLUSION

■■ The collision was solely and proximately caused by the faults and negligence of the DARBY as enumerated above. If there is any doubt as to the propriety of the navigation of the SOYA ATLANTIC, she should be relieved under the doctrine of the major-and-minor-fault rule, for the gross misconduct of the DARBY wholly accounts for the collision.

The foregoing embodies the court's Findings of Fact and Conclusions of Law pursuant to Rule 46½ of the Rules of Practice in Admiralty and Maritime Cases, 28 U.S.C.A. Interlocutory decrees fixing liability in conformity therewith may be submitted for signature.